

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

YING-JUN CHEN,

    *Plaintiff,*

v.

MARYLAND DEPARTMENT OF
HEALTH AND MENTAL
HYGIENE, ET AL.,

    *Defendants.*

Civil Action No.: ELH-15-01796

## MEMORANDUM OPINION

Ying-Jun Chen, a Chinese-American who is self-represented, filed suit against his former employers, the Maryland Health Care Commission ("MHCC") and the Maryland Department of Health and Mental Hygiene ("MDHMH" or "DHMH"), as well as the Secretary of MDHMH, Van T. Mitchell; the Acting Director of MHCC, Michael Steffen; and an MHCC administrator, Bridget Zombro (the "Individual Defendants"). Chen alleges harassment and discrimination based on national origin, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); the Fourteenth Amendment to the United States Constitution; and Article 26 of the Maryland Declaration of Rights. ECF 1.

By Memorandum Opinion (ECF 12) and Order (ECF 13) of February 17, 2016, I granted "Defendants' Motion to Dismiss" (ECF 6), with leave to amend the Title VII claim for discrimination as to the MHCC, the MDHMH, and the Individual Defendants in their official capacities. Chen subsequently filed an "Amended Complaint for Declaratory Relief, Injunctive Relief, Damages, and Costs" (the "Amended Complaint"). ECF 14. It is supported by numerous

exhibits. ECF 14-2 through ECF 14-21.[1]  Defendants have moved to dismiss the Amended

Complaint (ECF 15), pursuant to Fed. R. Civ. P. 12(b)(6), accompanied by a memorandum of

law (ECF 15-1) (collectively, the "Motion").    Chen opposes the Motion (ECF 22, the

"Opposition"), and defendants have replied. ECF 27 (the "Reply").[2]

The Motion has been fully briefed, and no hearing is necessary to resolve it. *See* Local

Rule 105.6. For the reasons that follow, I will deny the Motion.

## I. Factual and Procedural Background[3]

The MDHMH is "a principal unit in the executive branch of state government." *Id.* at 5

¶ 14. MHCC is "an independent regulatory agency that functions within MDHMH." *Id.* at 5

---

[1] The Amended Complaint is not a model of clarity. It relies on exhibits that plaintiff attached to the Complaint (ECF 1-2 through ECF 1-33) as well as additional exhibits attached to the Amended Complaint. ECF 14-2 through ECF 14-21. In some instances, however, the Amended Complaint's citations to the record do not correspond to plaintiff's voluminous submissions, and it is not apparent on which documents plaintiff relies. For example, ¶ 31 of the Amended Complaint cites to "Exhibit D," which appears to be a "Notice of Disciplinary Action" dated December 7, 2010. Exhibit D (ECF 1-5), however, is a copy of plaintiff's resume. Accordingly, I refer to exhibits attached to the Amended Complaint (ECF 14) and exhibits attached to the Complaint (ECF 1) insofar as they are clearly referenced by the Amended Complaint (ECF 14). Plaintiff contests the truthfulness of some of his exhibits, such as his performance evaluations. As discussed, *infra*, I do not accept as true the content of plaintiff's exhibits merely because plaintiff has submitted them.

[2] Chen also filed "Plaintiff's Motion for Summary Judgment" (ECF 23), accompanied by a memorandum of law (ECF 23-1) (collectively, the "Summary Judgment Motion") and numerous exhibits. ECF 23-2 through ECF 23-34. By Order of April 18, 2016 (ECF 24), I denied the Summary Judgment Motion as premature, without prejudice to Chen's right to renew his motion at a later date.

[3] Plaintiff's Amended Complaint (ECF 14) largely reiterates and expands on factual allegations contained in the Complaint. ECF 1. Accordingly, I incorporate here the "Factual and Procedural Background" contained in my Memorandum Opinion of February 17, 2016. ECF 12 at 2-15. As discussed, *infra*, given the posture of the case, I assume the truth of the factual allegations.

¶ 16. Chen joined the MHCC in December 2009 and worked as a policy analyst. ECF 14 at 7 ¶¶ 23-24.

Chen was born in China (*id.* at 41 ¶ 131) and became a naturalized U.S. citizen in 2007. *Id.* at 5 ¶ 13. He was terminated from State employment on January 18, 2012. *Id.* at 37 ¶ 111; *see* ECF 14-17 at 5-7, Notice of Termination.

According to Chen, he has a "noticeable accent . . . ." ECF 14 at 41 ¶ 130. He also claims that he was "the only foreign born Policy Analyst working in MHCC" and that "[o]nly a handful [of] others like him in [the] MDHMH-wide workforce of 6,000-plus professional staff were identified as foreign born professionals." *Id.* at 7 ¶ 23.

When Chen first joined the MHCC, he was "placed on a 180-day probation period, during which he stood to lose the position if any performance problems arose." *Id.* at 7-8 ¶ 25. "[T]his probationary period was a standard opportunity afforded to all policy analysts to allow them to gain a prospective [sic] of MHCC programs related to medical facilities and services." *Id.* at 8 ¶ 25. Chen satisfactorily completed his probationary period in June 2010. *Id.* at 8 ¶ 26. From December 2009 until November 2010, he "performed his duties, by all accounts, satisfactorily." *Id.*

Chen contends that he was subjected to a series of adverse employment actions because of his national origin. He asserts, *id.* at 2 ¶ 3:

> During the last twelve months of his employment with MHCC, Plaintiff received three suspensions for a total of thirty workdays without pay and two fraudulent unsatisfactory performance ratings. After Plaintiff returned from consecutive suspension[s], he was forced to take a leave and not allowed to return to his office for having allegedly failed to meet standards. . . . He was then terminated without just cause and for stated reasons that are obvious pretext for discrimination on the basis of national origin against him.

- 3 -

In particular, Chen maintains that on December 2, 2010, "amidst intense focus" on an assignment, Linda Bartnyska, his supervisor, "walked in [his] cubicle and started yelling at him for being unresponsive to an e-mail she had just sent." ECF 14 at 9 ¶ 28. Chen "stayed calm." *Id.* After Chen responded to the email he "walked to [Bartnyska's] office and explained why he missed her email, hoping to calm her down." *Id.* Chen submits, *id.*: "He took a bow - as in leaning his upper body slightly -- over a conference table to regret [sic]." *Id.*

Chen was subsequently called to a meeting with Zombro, who "told [Chen] that he faced a five-day suspension without pay for 'what happened between you and your supervisor on December 2, 2010' . . . ." *Id.* at 9 ¶ 29. Chen avers, *id.* at 9-10 ¶ 31 (alterations in original): "The Notice of Disciplinary Action given on December 7, 2010, indicates that the disciplinary action was based on Defendant Zombro applying to him 'inappropriate behavior in workplace' - in reference to the 'conversation in her [Bartnyska's] office where you raised your voice and leaning [sic] over a conference table in a manner that was intimidating.'" (Brackets in original). According to Chen, he "explained to Zombro that he did not yell, or raise his voice, on that day, as charged, and that he was trying to calm his supervisor down after another instance of her outbursts, of which Zombro was well aware." *Id.* at 10 ¶ 33. When Zombro refused to reconsider Chen's suspension, Chen asked to speak with Steffen, his "second-level supervisor." *Id.* at 10 ¶ 34. Zombro then told Chen, *id.* (alterations in original): "'Ben [Steffen] had left early for the day. But, if you agree to resign after the report's [sic] released, everything would be fine.'" Chen refused. *Id.*

Thereafter, Chen appealed his five-day suspension to Rex Cowdry, MHCC's Executive Director. *See id.* at 10, 12 ¶¶ 35, 39; ECF 14-2 at 2-3, email from Chen to Cowdry, dated Dec.

22, 2010. By email of January 7, 2011, Cowdry denied Chen's appeal. ECF 14-2 at 4. Cowdry wrote, in pertinent part, *id.*:

> In your appeal, you have restated your assertions about your behavior, but have presented no new evidence, nor any witnesses to corroborate your description of the events. In contrast, several individuals corroborate various parts of your supervisor's description of the events. There are no grounds for a reversal on this basis.

According to plaintiff, ECF 14 at 12 ¶ 36: "Defendant Zombro did not impose any discipline on Bartnyska for her outbursts in yelling at the start of the incident, an very [sic] inappropriate behavior that was very 'disruptive to many of your co-workers.'"

On December 21, 2010, plaintiff's supervisors rated his performance as "'Satisfactory'" in a "Mid-Cycle PEP[4] Evaluation." *Id.* at 12 ¶ 38. About a month later, on January 20, 2011, "Bartnyska lauded praise and appreciation of Chen's analytic works" with respect to a biennial MHCC report. *Id.* at 13 ¶ 40.

Chen alleges that, on or about April 14, 2011, Zombro assigned him to assist Leslie LeBrecque and Norman Ringel, who worked in a different division, with "'programing assignments . . . .'" *Id.* at 14 ¶ 43. Thereafter, Chen "divid[ed] his time between two divisions . . . ." *Id.* at 14 ¶ 45.

At some unspecified point in April 2011, Cowdry resigned and Steffen was named "acting director of MHCC." *Id.* at 14-15 ¶ 47. Chen asserts, *id.* at 15 ¶ 48 (emphasis and alterations in original):

> In late afternoon of a Friday in late April, Bartnyska told Chen that they would go to "happy hours" [sic] after work in a nearby bar on Reisterstown Road

---

[4] "PEP" is an abbreviation for "Performance Planning & Evaluation Program." *See* ECF 1-15.

to celebrate Steffen's "promotion." When Chen arrived after his workday, he saw
Steffen with three co-workers-- Bartnyska, [Karen] Rezabek and [Suellen]
Wideman- in a booth. Steffen seemed surprised at Chen's presence, and still
offered him "a beer on my tab." When Chen opted for a non-alcoholic brand
because he had a long driving [sic] home afterward, Steffen seemed annoyed, "If
you want to drink with us, drink like an American." Chen took it as a crack joke
and just laughed it out loud. Later on and to Chen's surprise, Steffen said in a
demeaning tone, "You should go *home* if you don't drink American [alcoholic]
beer," as he squeezed himself out of the booth before embarking on his way down
the stairway and out of the bar. Chen was speechless amidst moments of silence.
He soon bowed to the co-workers and out [sic] on his way home in Virginia.

On June 23, 2011, Chen received an "End-Year PEP Evaluation with an unsatisfactory
overall rating, which was prepared and signed by Norman Ringel, with whom Chen had only
worked for three months." *Id.* at 15 ¶ 49. The evaluation (ECF 14-5 at 2-7) is only partially
legible. Ringel rated Chen's performance as "Unsatisfactory" in the following categories:
"Works cooperatively with others to implement the Department's goals"; "Speaks effectively";
"Writes effectively (clear, organized, appropriate grammar, punctuation)"; "Interacts positively
with co-workers"; "Is courteous to customers and co-workers"; "Provides timely, accurate and
appropriate information to internal and external customers"; "Keeps commitments and follows
through on customer requests"; "Solves problems without being asked"; "Engages in
opportunities for self-improvement"; "Appropriately prioritizes work"; "Completes assignments
accurately and on time"; "Exercises appropriate judgment"; and "Follows directions." *Id.* at 5.

Under the section "Supervisor[']s Comments," Ringel wrote, in relevant part, *id.* at 2:

Chen is an adequate SAS programmer. First impressions are of an
enthusiastic employee willing to take on any data processing task.

Second impressions reveal an individual who may go off in his own
direction, needs improvement with communication skills, may not follow
directions and cooperate with staff, and may not take certain initiatives.

Chen maintains that his June 2011 PEP Evaluation did not accurately reflect his performance as it evaluated only his work on programming assignments. ECF 14 at 16 ¶ 50. Moreover, Bartnyska, his "immediate supervisor," had not discussed the evaluation with him. *Id.* According to plaintiff, however, he was unable to address his concerns about the evaluation before Ringle's retirement. *See id.* at 16 ¶ 51.

On July 6, 2011, Zombro approached Chen concerning the PEP Evaluation that Ringle had prepared. *Id.* at 16 ¶ 52. Zombro asked Chen to sign the evaluation, and Chen initially refused. *Id.* at 16-17 ¶ 52. However, Zombro ultimately persuaded Chen to sign the PEP Evaluation, with the assurance that "'[n]o one would bother to read this stuff in six months . . . and as your [immediate] supervisor, I would hold the line so your future ratings not [to be] [sic] affected by this [unsatisfactory rating].'" *Id.* at 17 ¶ 53 (alterations in original).

After Chen arrived at work on July 12, 2011, he received a copy of his PEP Evaluation with an "extra 2-page document titled 'performance improvement plan', or PIP . . . , which he had never seen, nor was it certified by anybody, as required by the relevant PEP Guidelines for a PIP." *Id.* at 14 ¶ 54. A "Performance Improvement Plan" ("PIP") as to Chen, dated June 23, 2011, identified his performance in the following areas as "Needs Work (Unsatisfactory)": "Working independently"; "Self checking results"; "Ability to understand and use statistical formulas"; "Ability to accurately/clearly explain analytical results in written text"; "Demonstrates an increasing knowledge of the MCDB,[5] expertise in its use"; "Prepares at least one technical analysis using the MCDB"; "Reports progress, resolves questions needing decision with supervisor"; "Provides data analysis, text development, and document reviews for the health

---

[5] The record does not indicate to what "MCDB" refers.

insurance coverage report"; "Prepares at least one technical analysis using the MCDB or other data in accordance with the approved study and design and timeline." ECF 1-9 at 2.

The PIP also stated, *id.* at 3: "This plan will be reviewed monthly, as necessary, to work with Linda/Leslie on areas of difficulty and to note areas of strength. This plan, and any amendments, will be considered for the mid-cycle PEP, to take place on or before December 31st, 2011. The performance under the plan will be reevaluated in 180 days starting July 1, 2011." A "Special Note" at the end of the PIP stated, in relevant part, *id.*: "Mr. Chen was rated as satisfactory during his mid-term evaluation; it was due to the implement [sic] of a new performance evaluation system. Instruction[s] from DBM[6] were that all employees were to be rated Satisfactory."

During the summer and fall of 2011, Chen endeavored to improve his job performance. *See* ECF 14 at 18 ¶¶ 56-59.

On or about October 27, 2011, LaBrecque "walked in Chen's cubicle, and, without permission, took a picture of his personal *cell phone*." *Id.* at 19 ¶ 60 (emphasis in original). The following day, October 28, 2011, Chen's "desktop access to Internet [sic] was abruptly removed without notice." *Id.* at 19 ¶ 61. Because Chen required internet access to perform his job, he repeatedly requested restoration of his internet access. *See id.* at 19 ¶¶ 61-62.

Chen met with LeBrecque and Zombro on November 2, 2011. *Id.* at 19 ¶ 63. He avers, *id.*: "They told him, in raised voices, that his access was suspended because of his unsatisfactory performance appraisal in July 2011." Chen "became very upset because he needed the access for

---

[6] I assume that "DBM" refers to the Maryland Department of Budget and Management. *See About the Department of Budget and Management,* Department of Budget and Management (July 28, 2016), http://dbm.maryland.gov/Pages/AboutDBM.aspx.

his work assignment and in fact had such access until late October." *Id.* According to Chen, the "Performance Planning & Evaluation Program (PEP) Guidelines & Instructions" (ECF 1-15, the "PEP Guidelines") do not provide for the "removal of access to Internet associated with [a] particular rating of performance . . . ." ECF 14 at 19 ¶ 65.[7]

During Chen's meeting with LeBrecque and Zombro on November 2, 2011, they also "discuss[ed] [his] late return from lunch a few days earlier as a possible AWOL, even though [Chen] had made it up his [sic] lost time by having worked extra hours in the evening on the same day, and apologized, when turned [sic] in his timesheets, for not clearing it in advance." *Id.* at 20 ¶ 66.

On November 3, 2011, LeBrecque sent an email to Steffen with a copy to Zombro, concerning "Chen's verbal counseling session" on November 2, 2011. ECF 14-9 at 2. Chen claims that LeBrecque's email "depict[ed] . . . his behavior in demeaning terms and [made] false allegations." ECF 14 at 20-21 ¶ 68. The email said, in part, ECF 14-9 at 2:

> Last week I walked into Chen's office and he was on the internet and I asked him how he was able to access the internet because we had previously removed his access after his last evaluation. Chen said I cannot keep him off the internet because he bought a modem and a data plan and can get it that way. I was extremely alarmed at hearing this because connecting a modem to his computer which is connected to the network would violate the terms of many of our data use agreements and presents a significant security problem. I investigated further and was unable to find a modem, but in the process found out that his internet access was restored during our last power outage. I asked Marty to remove his access immediately and brought the whole issue up with Bridget because of the possible security issues and because he violated the terms of his performance improvement plan. Chen continues to suffer with his productivity and it has been

---

[7] The PEP Guidelines state, in relevant part, ECF 1-15 at 7 (underlined and bold in original): "Deficiencies in performance should **not** be allowed to linger until the next formal PEP Evaluation period. . . . If the employee's performance shows no improvement or remains inadequate after improvement, it should also be addressed through appropriate progressive discipline."

necessary for timeliness reasons to reassign projects that he was unable to complete.

Yesterday Bridget called me into her office to go over [Chen's] performance improvement plan and conduct a verbal counseling with Chen. Chen freely admitted using the internet even though he was instructed not to do so after his last evaluation due to his internet use taking time away from getting projects completed. Further he demanded to have his internet access restored and proclaimed that internet use during work hours is a right not a privilege. Chen repeatedly mocked Bridget for reprimanding him and laughed out loud at her several times. He raised his voice many times while cutting off Bridget as she was explaining why his behavior is unacceptable. Chen constantly changed the subject and attempted many times to tell Bridget how he thinks things are instead of listening. Chen threatened to go to the Secretary and to the Governor if his internet access was not restored.

Also by email of November 3, 2011, Zombro notified Chen that his "timesheet has been changed from code 50 (preapproved personal time) to code 86 (unauthorized leave)[.] You will not be paid . . . [f]or the 2.7 hours that you were not in the building on October 28th, 2011." ECF 14-8 at 2.

By email to Chen of November 4, 2011, Steffen stated, in pertinent part, ECF 14-10 at 2:

I understand that a meeting was held Wednesday with Leslie and Bridget regarding work performance and Internet use. They have sent me a description of your behavior during the meeting. I have carefully read their descriptions of that meeting. Consistent with state policy, I would like you to provide your perspective on the meeting.

Chen responded, *id.*:

1. I would like to apologize for being emotional in conversation with Bridget (I still think that they've been coming too hard on me, unbearable at times);

2. I have abided, and will continue to abide, all the provisions of the MHCC's Telecommunication Usage Agreements;

3. I did not "mock" anybody, nor "threaten" anything;

4. I have been using the internet uninterrupted to complete my assignments, including the recent download and processing of CPS/ ASEC survey data and updates;

5. I have completed all my assignments on time with prudence, efficiency, and professionalism; And [sic]

6. I shall continue working hard on improving my communication skills[.]

In a "Memorandum" to Chen dated November 8, 2011, Steffen stated, in part, ECF 1-10

at 3:

On Wednesday November 2, 2011 Bridget Zombro and Leslie LaBrecque held a meeting with you to discuss your Performance Improvement Plan and AWOL incident that recently occurred. I was informed that your behavior was inappropriate during the meeting; raising your voice many times, cutting Bridget off, laughing and rolling your eyes. I reviewed your statement of the incident on Friday, November 4, 2011 and Mitigation was held on November 7, 2011[.]

You did admit that you had an emotional conversation in the meeting with Bridget and Leslie. This type of unprofessional behavior in the work place is not appropriate and will not be tolerated.

Inappropriate behavior in the work place is a serious issue and will be handled as such. Should behavior such as this continue, you will be subject to progressive discipline which could result in termination.

Pursuant to a "Notice of Disciplinary Action" signed by Steffen the next day (November

9, 2011), MHCC suspended Chen without pay for ten days, from November 9, 2011 until

November 22, 2011. ECF 1-10 at 2.

Chen maintains that "Steffen insisted on Plaintiff going back to his desk and read[ing]

[the Notice of Disciplinary Action] more carefully – on an apparent bias that he had 'a language

problem' to the extend [sic] that he was unable to communicate well, and/or read carefully in

English." ECF 14 at 23 ¶ 74. Chen avers, *id.* at 23 ¶ 75: "As soon as Plaintiff went back to his

cubicle, Zombro walked in and asked him to leave, or she would call for state police. He was allowed to take only personal items, his bags and clothing, and led out of the building."

Chen contends, ECF 14 at 20 ¶ 67: "[O]ther co-workers were ordinarily allowed to make it up [sic] their lost time, such as in lunch . . . ." In addition, plaintiff submits that MHCC has never removed internet access from other employees "who were found or well known for having spent hours of work time surfing and/or viewing material unrelated to work on the Internet." *Id.* at 19 ¶ 65. He asserts, *id.* at 19-20 ¶ 65:

> Personally, Chen had observed . . . Bartnyska routinely placing, and printing out, orders of wines and spirits online at work; and . . . LeBrecque quietly playing the classic computer game, Tetris, the 3-D version available only on the Internet from her desktop computer; and not to mention Ringel, who spent almost his entire day on [the] Internet, and often needed to be dragged away from it at lunch times.

Plaintiff also submits that "Steffen imposed no disciplinary action on LeBrecque for her inappropriate behavior of making false allegation [sic] about the cause so [sic] for having his Internet access removed, and his behavior during the November 2, 2011 meeting with Defendant Zombro, where she was also present." *Id.* at 23-24 ¶ 76. Further, he contends that Steffen did not discipline LeBrecque or Zombro for "yelling and shouting in conversation with him during the same meeting on November 2, 2011, which were very inappropriate as superiors." *Id.* at 24 ¶ 77.

At approximately 6 P.M. on November 9, 2011, the first day of Chen's suspension, Chen returned to the MHCC office to discuss his suspension with Steffen. *Id.* at 24 ¶¶ 79-80. An "Interoffice Memorandum" from Bartnyska to Steffen, dated November 10, 2011, provides Bartnyska's account of Chen's activities at the MHCC office on the evening of November 9, 2011. Bartnyska stated, in part, ECF 14-11 at 2-3:

At approximately 6:15 pm I exited the MHCC offices. Because it was dark and my car was more than 50 yards from the front door, I paused in the glass vestibule and surveyed the parking lot before leaving the building. I saw only about a dozen or so cars. Within seconds after exiting the vestibule, Mr. Chen came running towards me, calling out loudly, "Linda, I want to talk to you." I was surprised and definitely frightened. He had, apparently, been waiting in his car in the parking lot for me to exit the building; because he and I work the same 9:30-6:00 schedule, he knew when I would typically leave the building.

I responded, "I'm not going to talk with you," and began walking very fast toward my car. But Mr. Chen continued coming toward me and began following me to my car. Now I was very frightened. I worried what he would do to me, and in a panic, I turned and ran back to the building. I entered the vestibule and began using my key card to enter the building. To my horror, Mr. Chen pursued me into the vestibule and stood right next to the key pad, within inches of me. I jumped back and said assertively, "If you touch me, I'll call the police!" He responded loudly, "I not [sic] going to touch you, but I want to talk to you," making it clear to me that he intended to get what he wanted.

Now terrified, I didn't know what to do. If I left the vestibule for my car, he would undoubtedly follow me to my car and I couldn't out run him. He was standing right next to the key pad, so in order to enter the building I would have to stand very close to him, which I didn't want to do. Besides that, I was certain that if I entered my key code, he intended to follow me into the building and that I wouldn't be able to stop him. I was afraid of what he would do if he got inside the building, given his very aggressive behavior. Desperate to get him to leave, I said, "I can't let you into the building; you're not supposed to be in the building." "Well then I'll let myself in," he said. Because his key card was supposed to have been disabled, I figured it would take him several attempts at entering his key code before he realized he couldn't enter the building, which would given [sic] me time to get to my car. As soon as he turned his back to me to face the key pad, I ran from the vestibule to my car as fast as I could.

Once inside my car, I turned to see if he had followed me, but he was nowhere in sight. Apparently, his key code had not been disabled and he had entered the building. Now I was concerned for the safety of the MHCC staff that remained in the building and the Commission's property. In a panic, I immediately called Bridget Zombro on her personal cell phone, quickly explained the situation and asked her what to do. She told me to call Security and have him escorted from the building.

However, I didn't have the phone number for Security on my cell phone. So I returned to the building to get the number. Upon entering the building, I heard Mr. Chen's voice and saw him standing in the doorway of your office. Concerned

> for your safety, I immediately went to your office and told you that Bridget said we should call Security and have Mr. Chen escorted from the building.
>
> When you waved me off, I concluded that you felt as though you had things under control. So instead of calling Security on my own, I returned to my car and called Bridget again to tell her what had happened. She asked me to stay in the parking lot until Mr. Chen left the building to make sure that you and the other MHCC staff members were safe; she stayed on the phone with me to make sure I was safe. In a few minutes, Mr. Chen left the building and went straight to his car. After he had driven off the parking lot, Bridget and I ended our call and I left for home.

Chen maintains that Bartnyska's "Interoffice Memorandum" (ECF 14-11) "contained defaming statements about [him] having reached out for her help in distress, and outrageous allegation [sic] that [he] had waited for and followed her to her car in the parking lot when he returned." ECF 14 at 25 ¶ 83. Chen's own brief description of the incident, however, is otherwise substantially consistent with Bartnyska's account. *See id.* at 24-25 ¶¶ 79-82.

By email of November 14, 2011, Chen asked Steffen to reconsider his ten-day suspension. *Id.* at 26 ¶ 84; ECF 1-11 at 2-3. Chen wrote, in relevant part, ECF 1-11 at 2: "I would like to apologize for being emotional in my conversation with Bridget Zombro on November 2, 2011. And I owe an apology to Leslie LaBrecque for my failure to inform her, both in advance and afterward, of the extended lunch break I took on October 28, 2011." Chen explained that his "behavior—raising my voices [sic], cutting Bridget off, laughing and rolling my eyes—were not inappropriate" in light of the circumstances of his conversation with Zombro and applicable Maryland state guidelines for "'Conduct and Behavioral Issues.'" *Id.*

On November 16, 2011, Steffen sent an email to Zombro, with a copy to Chen, to "provide[] documentation on [Chen's] appearance at the MHCC on November 9, 2011." ECF 1-12 at 2; *see* ECF 14 at 26 ¶ 86. The email said, in relevant part, ECF 1-12 at 2:

Mr. Chen appeared in my office and requested a meeting. The meeting was unexpected and I stated to the Mr. Chen [sic] that he was on a 2-week suspension. I told Mr. Chen that he had to leave. Mr. Chen stated he just needed to provide a few facts. I told him to sit down as he was polite, but quite agitated.

Mr. Chen reviewed the facts of his case with me, Mr. Chen stated that he had talked with the Chief Counsel at DHMH. I asked him at that point to leave as I viewed the reference to the 'General Counsel' as an attempt to intimidate. Mr. Chen continued, he stated that the meeting on November 2nd was not a performance counseling meeting, he had not been informed of the nature of the meeting and therefore it was a discussion behind closed doors with his supervisor. I told him a decision had been made consistent with state personnel policy.

Mr. Chen requested that Mr. David Sharp,[8] be called to mediate, because he had a language problem. He stated that I said at staff [sic] meeting that David Sharp would mediate personnel issues where language problems were the issue. I have no recollection of ever suggesting this odd protocol. I told him, for the third time that he had to leave and that any further communication during the 2-week suspension period must be in writing or via email. I told in the strongest terms, that he must leave immediately. Mr. Chen left the building.

Mr. Chen['s] behavior disrupted the work at the MHCC on November 9th. Only after the 3rd request did Mr. Chen leave the building. His unexpected appearance at the building was alarming and violated the condition of his 2-week suspension. After he left, I instructed all employees to depart for the evening. I closed and locked the offices at approximately 6:15 PM after confirming that no one remained inside.

Chen maintains, ECF 14 at 26 ¶ 86: "This e-mail contains a number of inaccurate statements, such as the timing of Chen's appearance and the lockdown of office [sic] after he left . . . ." According to Chen, "Steffen's e-mail also contains statements that disparages [sic] [him] for having 'a language problem' – in reference to his accent to the extent that he was incapable to [sic] communicate well in English, and ridicules his appearance as imminent dangers [sic] to his co-workers and the building." *Id.* at 27 ¶ 87.

---

[8] The record does not identify Sharp or indicate in what capacity he works.

On November 28, 2011, Chen returned to work following his ten-day suspension. *Id.* at
28 ¶ 88. Later that day, Steffen met with Chen and "gave [him] a piece of paper with eight (8)
questions on it and told him to verbally answer them, which he did." *Id.*   The questions
concerned Chen's return to the MHCC building on November 9, 2011. ECF 14-12 at 2. Steffen
also explained to Chen that Zombro would conduct an investigation as to why Chen returned to
the MHCC office on November 9, 2011. ECF 14 at 28 ¶ 90.

The following day, November 29, 2011, Chen met with Zombro and LaBrecque and
discussed why he returned to the MHCC office on November 9, 2011. *Id.* at 28 ¶ 91. During the
meeting, Chen disputed Bartnyska's account of what had transpired. *Id.* "A couple hours later,"
Chen was summoned to Steffen's office and given a fifteen-day suspension, without pay. *Id.* at
28 ¶ 92. A "Memorandum" from Steffen to Chen, dated November 29, 2011, indicated that the
suspension was imposed for inappropriate behavior in the workplace relating to Chen's return to
the office on the evening of November 9, 2011. ECF 1-13 at 16. It was effective November 30,
2011 through December 20, 2011. *Id.* The Memorandum said, in relevant part, ECF 1-13 at 16:

> On the morning of Wednesday, November 9, 2011 you received a ten (10)
> day suspension for inappropriate behavior in the work place. At that time, you
> were verbally told that you could not return to the building until Monday,
> November 28, 2011. This was also stated in writing and issued to you with the
> Discipline on November 9, 2011.
>
> At approximately 6:15 pm on the evening of November 9, 2011, you
> returned back to the office and used your pass key to gain entry into the building
> although you were previously instructed not [to] do so. In addition to returning to
> the office, a complaint was filed for your inappropriate behavior towards another
> MHCC Supervisor. It was stated that you confronted your previous Supervisor in
> the parking lot about not returning voicemails that were left earlier in the day.
> You were informed that the situation was not going to be discussed at that time,
> and were advised to leave the area. As a result of feeling uncomfortable, the
> Supervisor attempted to quickly get to her vehicle. After realizing that you were
> still quickly following, she felt threatened and returned to the building. Once in

the building vestibule, you continued to confront her and you were informed again that you needed to leave. You advised the supervisor that you wanted to talk to her and you would let yourself into the building. While you were attempting to get into the building the Supervisor ran for her vehicle, where she then called an Appointing Authority to notify her of the situation.

Inappropriate behavior in the work place is a serious issue and will be handled as such. Should behavior such as this continue, you will be subject to progressive discipline which could result in termination.

Chen contends, *id.* at 29 ¶ 93: "In [his] decision to impose this suspension, Defendant Steffen did not consider Plaintiff's mitigating circumstances to the alleged 'inappropriate behavior' because of his bias against his accent - to the extent that he was unable to give straight answer [sic] to his questions, or communicate well in English." Plaintiff also maintains that Steffen treated plaintiff's superiors differently. In particular, Chen avers, *id.* at 29-30 ¶ 94 (emphasis and alterations in original): "Defendant Steffen impose[d] *no* disciplinary action against Bartnyska for her inappropriate and unprofessional behavior in making outrageous allegations, which Defendant Steffen himself had investigated and proved to be [a] '[N]on-event.'"

By letter of December 12, 2011, an attorney for plaintiff asked Joshua Sharfstein, M.D., Secretary of MDHMH, to lift the 15-day suspension because it was "lacking both a legal and factual basis . . . ." ECF 1-13 at 3; *see also id.* 3-7, ECF 14 at 30-31 ¶ 95. From the record, it is not apparent what action, if any, Sharfstein took.

Chen returned to work on December 21, 2011, and "on arrival" received a Mid-Cycle PEP Evaluation with an unsatisfactory overall rating. ECF 14 at 31 ¶ 97. A "State of Maryland Performance Evaluation for Non-Supervisory Employees," which LaBrecque and Zombro signed on December 21, 2011 (ECF 1-14 at 5), indicates that Chen had an "Unstatisfactory [sic]" "Mid

Cycle Rating." *Id.* at 4; *see id.* at 2-5.   A portion of the evaluation, titled "Training Recommendations," states: "Need[s] better communication skills. Chen does not understand the tasks we are asking of him. Language seems to a [sic] barrier." *Id.* at 5.   In the section titled "Supervisor's Comments," the form says, in relevant part, ECF 1-14 at 5:

> Mr. Chen does adequate work when given highly structured and annotated instructions.   He has worked well with Madeline on very straightforward data processing tasks that she clearly lays out.   However, if given more than 1 assignment or a task is more complex, Mr. Chen creates numerous diversions as to why the work can't be done, most of which I can't understand. When asked to work with others collaboratively he is at times extremely rude. When attempting to provide him constructive guidance in getting his work done, he has a difficult time listening. He attends meetings but ignores everyone and reads papers while in attendance. Chen expends enormous time on the internet . . . .[9]

After Chen received the "Mid-Cycle PEP Evaluation," he was "ordered . . . to leave for home until further notice." ECF 14 at 31 ¶ 97.  A letter from Zombro to Chen, dated December 21, 2011, stated:  "Effective December 21, 2011, you are placed on paid administrative leave, you are not allowed to return to this office until further notice." ECF 14-14 at 2.

By email of December 26, 2011, Chen provided Steffen with a "written response" to his "Mid-Cycle PEP Evaluation." ECF 14 at 33 ¶ 101; ECF 1-16 at 2-4, email from Chen to Steffen dated Dec. 26, 2011. Chen pointed to four examples of his job performance that, in his view, "deserve a better than Satisfactory Overall Work Quality rating . . . ." ECF 1-16 at 2 (underlined in original). Chen also wrote, *id.* at 3: "The way by which my mid-cycle evaluation was rated raises questions on the completeness of its entirety and the fairness of any less than satisfactory rating by each performance standard."  The following day, Zombro, on behalf of Steffen,

---

[9] Chen's submissions apparently provide only a portion of the "State of Maryland Performance Evaluation for Non-Supervisory Employees."   The final sentence of the "Supervisor's Comments" is cut off mid-sentence. ECF 1-14 at 5.

acknowledged receipt of Chen's response and indicated that the performance evaluation, along with Chen's response, would be forwarded to "Personnel." ECF 1-16 at 4, email from Zombro to Chen dated Dec. 27, 2011.

By email of December 28, 2011, Zombro asked Chen to return to the MHCC office. ECF 14 at 34 ¶ 103. Upon Chen's return, Zombro asked Chen to "sign on another copy of his unsigned Mid-Cycle PEP, which Defendant Zombro, and LeBrecque, signed on December 21, 2011." *Id.* Chen signed the evaluation, "with disagreements." ECF 1-14 at 5. Chen avers, ECF 14 at 34 ¶ 104: "Zombro then ordered Chen to sign on a demeaning 'Acknowledgement,' as witnessed by a member of her staff, in apparent bias to him having 'a language problem,' or barrier, to the extend [sic] that he was unable to communicate well in English." A brief statement, dated December 28, 2011 and signed by Chen and "Andrea Allen,"[10] provides, in its entirety, ECF 14-16 at 2: "I acknowledge that I received a copy of my PEP that I was able to sign with disagreements on December 28th, 2011."

On January 2, 2012, Chen sent an email to Steffen, setting out "another written response to the signed mid-cycle evaluation reiterating that the evaluation was still not complete, nor its rating accurate." ECF 14 at 34 ¶ 105.

In an email of January 11, 2012, Zombro asked Chen to come to her office on January 18, 2011, to discuss Chen's "employment status." ECF 1-17 at 2; *see* ECF 14 at 34 ¶ 107. Steffen also attended the meeting. *See* ECF 14 at 35 ¶ 108. Thereafter, on January 18, 2012, Chen wrote a document titled "Minutes of Meeting" (ECF 14-17 at 8-9), which he emailed to his attorney. *See* ECF 14-17 at 2-4. The "Minutes of Meeting" contain the following account, *id.* at 8:

---

[10] The record does not identify Allen or indicate in what capacity Allen works.

Mr. Steffen: Chen, we're terminating you as a results [sic] of your unsatisfactory ratings, one in June and the other in December according to relevant regulations. Your skill sets are not meeting the performance standard as you struggled to improve, which turned out to be unsatisfactory. We're doing this in order for you to move on looking for opportunities that meet your area of expertise not needed in this agency. Here is the notice (handing over a 3-page document to me.)

Me: (receiving and quickly reading the handed document, specifically on the section of "EXPLANATION OF TERMINATION", and found many inconsistencies.) Can I be given more time to read this more carefully, and come back with questions to ask you?

Ms. Zombro: We are here just to hand the document to you, can't really answer any of your questions. Any questions have to go to Harold Young, as printed on the document.

Me: I do have [a] few things I think you can clarify. Can you just to [sic] make sure what kind of termination this is? Based on my understanding of the relevant rules, a termination has to be either "with prejudice" or "without prejudice" and you have both printed here without specifying, how do I know which?

Ms. Zombro: I don't really know the answer because this was not prepared by me. You should clarify with the Department that prepared this.

The Notice of Termination (ECF 14-17 at 5-7), which Steffen signed on January 11, 2012

(*id.* at 7), provided, in relevant part, *id.* at 6:

During the rating period of July 2011 through December 2011, meetings were held to address work performance issues and concerns with Mr. Chen. A project tracking chart was created to outline issuance date, due date and comments of Mr. Chen's assigned projects. In many instances, missed deadlines and assignments done incorrectly were addressed via email to Mr. Chen. Two disciplinary actions were issued to Mr. Chen during this rating period for inappropriate and unprofessional behavior in the work place.

As a result of work performance issues and multiple occurrences of inappropriate behavior in the work place, Mr. Chen's Mid-Cycle (180 day) rating of his Performance Evaluation was unsatisfactory. A PEP meeting was held on December 21, 2011 to discuss the mid-cycle evaluation. On December 28, 2011 Mr. Chen received the signed copy of his evaluation.

Mr. Chen has received a total of three suspensions for inappropriate and unprofessional behavior in the work place.

- 20 -

Plaintiff maintains that "MDHMH fired [him] because of its belief that policy analysts with an accent were incapable to do well at MDHMH, or MHCC." ECF 14 at 37 ¶ 110. Apparently to demonstrate that he had been targeted for termination based on his national origin, Chen appended to his Amended Complaint an "Annual Personnel Report for Fiscal Year 2012" (the "Report"), dated January 1, 2013, which the Maryland Department of Budget and Management produced. ECF 14-18 at 2-29; *see* ECF 14 at 37 ¶ 112.[11] With exceptions not relevant here, the Report "provides information related to the State Personnel Management System and the Maryland Department of Transportation . . . as of June 30, 2012." ECF 14-18 at 4.   Chen relies on a chart in the Report, titled "Distribution of Employee Performance by Category By Principal Department As of June 30, 2012." *Id.* at 20.  It shows that 36 employees in the MDHMH received "Unsatisfactory" performance evaluations. *Id.*; *see* ECF 14 at 37 ¶ 112 ("During the same fiscal year, there had been at least thirty-five of Chen's co-workers similarly situated at MDHMH/MHCC who were also rated unsatisfactory in performance of their duties.").

Chen avers that "none was known having been terminated, according to the State's Annual Personnel Report for FY2012." *Id.*   However, I note that the exhibit does not provide information as to whether State employees who had received unsatisfactory performance evaluations were terminated. *See generally* ECF 14-18 at 2-29.  The chart titled "Distribution of Employee Performance by Category By Principal Department As of June 30, 2012" (*id.* at 20) reflects that 250 State employees across all departments received unsatisfactory performance evaluations.  The Report also states that, across all State departments, 250 employees were

---

[11] It is unclear whether Chen submitted a portion of the Report or all of it.

terminated. *Id.* at 13.[12] Accordingly, it is unclear on what basis Chen asserts that he was the sole MDHMH employee to be terminated because of an unsatisfactory performance evaluation.

Like the Complaint (ECF 1), the Amended Complaint (ECF 14) alleges that the defendants did not follow the appropriate procedures when they issued Chen negative performance evaluations and suspensions and ultimately terminated him. *See id.* at 37-39 ¶¶ 113-120. As I discussed at length in my Memorandum Opinion of February 17, 2016 (ECF 12), Chen has twice litigated these allegations in the Maryland Court of Special Appeals, and certiorari was sought but denied by the Maryland Court of Appeals. *Id.* at 12-14. *See Department of Health and Mental Hygiene, et al. v. Chen*, No. 909, Sept. Term 2013 (filed July 11, 2014), *cert. denied*, 440 Md. 225, 101 A.3d 1063 (2014); *Chen v. Maryland Dep't of Health & Mental Hygiene*, 223 Md. App. 770 (2015), *cert. denied*, 445 Md. 5, 122 A.3d 975 (2015).[13] I previously concluded that "Chen's due process claims challenging the procedure by which he was disciplined and terminated, under both the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights, are barred by the doctrine of res judicata." ECF 12 at 39.[14] Therefore, I need not reach these allegations advanced by Chen's Amended Complaint.

---

[12] According to the Report (ECF 14-18 at 2-29), thirteen of the employees who were terminated as of June 30, 2012, worked for "MDOT," *i.e.* the Maryland Department of Transportation. According to the chart titled "Distribution of Employee Performance by Category By Principal Department As of June 30, 2012" (*id.* at 20), most MDOT employees appear to have been "rated with alternative evaluations systems." *Id.* n.4. Accordingly, it appears that not all State employees with unsatisfactory performance evaluations were terminated.

[13] The second decision is not reported in A.3d.

[14] As discussed in my Memorandum Opinion of February 17, 2016 (*see* ECF 12 at 34-39), I raised, *sua sponte*, the issue of res judicata as to Chen's due process claims.

## II. Discussion

### A. Rule 12(b)(6)

The Motion is premised on Fed. R. Civ. P. 12(b)(6) ECF 15 at 1. A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young,* ___ U.S. ___, 133 S.Ct. 1709 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting

the claim asserted." *Johnson v. City of Shelby*, ___ U.S. ___, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted).

In reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual allegations contained in the complaint'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 402 (2011); *Monroe v. City of Charlottesville*, 579 U.S. 380, 385-86 (4th Cir. 2009), *cert. denied*, 559 U.S. 992 (2010). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the

legal remedy sought. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 1960 (2012).

A motion asserting failure to state a claim typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards*, 178 F.3d at 243 (quotation marks omitted); *see Houck*, 791 F. 3d at 484; *Tobey v. James*, 706 F.3d 379, 387 (4th Cir. 2013). But, "if all facts necessary to the affirmative defense 'clearly appear[] *on the face of the complaint*,'" or in other material that is the proper subject of consideration under Rule 12(b)(6), such a defense can be resolved on the basis of the facts alleged in the complaint. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc) (citation omitted) (emphasis in *Goodman*); *see Houck*, 791 F.3d at 484.

In resolving a motion under Rule 12(b)(6), a court is "generally limited to a review of the allegations of the complaint itself." *Goines*, 822 F.3d at 165-66; *see Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007); *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013) (*abrogated on other grounds* by *Reed v. Town of Gilbert, Ariz.*, ___ U.S. ___, 135 S. Ct. 2218 (2015), as recognized in *Cahaly v. Larosa*, 796 F.3d 399 (4th Cir. 2015)). Under limited exceptions, however, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

Of relevance here, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits . . . ." *Goines*, 822 F.3d at 166 (citations omitted); *see U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir.

- 25 -

2014) (quoting *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). A court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

As noted, plaintiff has attached numerous exhibits to the Amended Complaint (ECF 14-2 through ECF 14-21) and refers to many of the exhibits submitted with the Complaint. *See* ECF

1-2 through ECF 1-33. It is clear that plaintiff attached many of these exhibits precisely because he contends that they contain untrue statements about his job performance. *See, e.g.,* ECF 14 at 16, 26, 29 ¶¶ 50, 83, 93. Accordingly, I do not regard as true the content of the exhibits that plaintiff has submitted merely because he attached them as exhibits.

### B. Title VII

"Title VII . . . prohibits employers from discriminating on the basis of race, color, religion, sex, or national origin, or retaliating against their employees for opposing or seeking relief from such discrimination." *Green v. Brennan,* ___ U.S. ___, 136 S. Ct. 1769, 1773–74 (2016); s*ee Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 233 (4th Cir. 2016); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014). In order to prevail under Title VII, "the existence of some adverse employment action is required." *James v. Booz–Allen & Hamilton, Inc.,* 368 F.3d 371, 375 (4th Cir. 2004). An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC,* 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998)). Single acts that may not be cognizable as adverse actions on their own may, over time, cumulatively amount to an unlawful employment practice where they create a hostile work environment. *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115 (2002); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Hoyle,* 650 F.3d at 333–34.

In general, there are "two avenues" *at trial* by which a plaintiff may prove intentional employment discrimination. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284

(4th Cir. 2004) (en banc) (recognized in *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) as abrogated on other grounds by *Univ. of Texas Sw. Med. Ctr. v. Nassar*, ____ U.S. ____, 133 S. Ct. 2517 (2013)). The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Young v. United Parcel Serv., Inc.*, ____ U.S. ____, 135 S. Ct. 1338, 1345 (2015) (construing the Pregnancy Discrimination Act); *Guessous v. Fairview Prop. Investments, LLC*, ___ F.3d ___, 2016 WL 3615780, at *6 (4th Cir. July 6, 2016) (discussing the three steps of the *McDonnell Douglas* framework).

The *McDonnell Douglas* scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff" to prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted). Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

If the plaintiff chooses to proceed at trial under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 719 (4th Cir. 2013). Although the precise formulation of the required prima facie showing

will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an applicant "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle*, 650 F.3d at 336; *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

If the defendant submits no evidence of any legitimate basis for its actions, the fact-finder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). But, "[i]f the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11.

If the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie

case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

However, if the defendant meets its burden of production, the plaintiff must then prove, by a preponderance of evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trustees of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (emphasis in original)).

As noted, these two approaches establish the common methods by which a plaintiff may prove intentional employment discrimination *at trial*. *See Burns*, 96 F.3d at 731. At the summary judgment or motion to dismiss stage, however, these approaches merely serve to inform a court's evaluation of the allegations. *See Pettis v. Nottoway Cnty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas*. . . .").

To survive a motion to dismiss, an employment discrimination complaint need not include specific facts establishing a prima facie case of discrimination under the framework set forth in *McDonnell Douglas*. *See Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 508 (2002). This is because "[t]he prima facie case . . . is an evidentiary standard, not a pleading requirement." *Id.* at 510. As the Supreme Court explained in *Swierkiewicz*, requiring a plaintiff to plead a prima facie case would impose a "heightened pleading standard" that conflicts with Fed. R. Civ. P.

8(a)(2). *Id.* at 512. Rather, to survive a motion to dismiss, the complaint need only state "'a plausible claim for relief' that 'permit[s] the court to infer more than the mere possibility of misconduct' based upon 'its judicial experience and common sense.'" *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, ____ U.S.____, 132 S.Ct. 1327 (2012) (citation omitted).

In the posture of this case, the prima facie standard under *McDonnell Douglas* is not applicable. Indeed, the Fourth Circuit has admonished district courts to "'resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination *vel non.*'" *Merritt*, 601 F.3d at 295 (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991)) (alterations in *Merritt*; internal quotation marks omitted). The Fourth Circuit has observed that, "[n]otwithstanding the intricacies of proof schemes, the core of every Title VII case remains the same, necessitating resolution of 'the ultimate question of discrimination *vel non.*'" *Merritt,* 601 F.3d at 294-95 (citation omitted).[15] Thus, "[b]y the time of appeal especially, the issue boils down to whether the plaintiff has presented a triable question of intentional discrimination . . . ." *Id.* at 295.

---

[15] On several occasions where the employer proffered evidence in its motion for summary judgment of a legitimate reason for its adverse action, the Fourth Circuit has assumed, without deciding, that the plaintiff established a prima facie case. *See, e.g., Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007), *cert. denied*, 552 U.S. 1102 (2008); *Hux v. City of Newport News*, 451 F.3d 311, 314 (4th Cir. 2006); *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (en banc); *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319-20 (4th Cir. 2005); *cert. denied*, 546 U.S. 1091 (2006); *Rowe v. Marley Co.*, 233 F.3d 825, 829 (4th Cir. 2000); *see also Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 736-37 (D. Md. 2009); *Spriggs v. Pub. Serv. Comm'n*, 197 F. Supp. 2d 388, 394 (D. Md. 2002).

As noted, Chen alleges that he was wrongfully terminated, in violation of Title VII. *See*
ECF 14 at 2 ¶ 5. To state a claim for discrimination under Title VII, a plaintiff must allege: "'(1)
membership in a protected class; (2) satisfactory job performance; (3) adverse employment
action; and (4) different treatment from similarly situated employees outside the protected
class.'" *Goode v. Cent. Virginia Legal Aid Soc'y, Inc.*, 807 F.3d 619, 626 (4th Cir. 2015)
(quoting *Coleman*, 626 F.3d at 190); *accord Gerner v. Cnty. of Chesterfield, Va.*, 674 F.3d 264,
266 (4th Cir. 2012).[16]

Chen is a member of a protected class, because he was born in China. He also alleges
that he had satisfactory job performance. *See, e.g.,* ECF 14 at 8 ¶ 26. And, Chen's termination
was clearly an adverse employment action. Accordingly, as defendants concede (ECF 15-1 at 9-
10), plaintiff adequately alleges the first three elements for discrimination under Title VII.

Citing *McCleary-Evans v. Dep't of Transportation*, 780 F.3d 582, 585-86 (4th Cir. 2016)
(ECF 15-1 at 9), defendants argue that Chen has "failed to plead facts sufficient to show that the
adverse employment action was taken as a result of his national origin." ECF 15-1 at 10.
Defendants maintain that plaintiff's "conclusory claims do not support a reasonable inference
that he was terminated because the decision makers were motivated by bias." *Id.* In particular,
defendants aver, *id.* at 10-11:

---

[16] In *McDonnell Douglas,* the prima facie case of racial discrimination in hiring was
formulated as follows, 411 U.S. at 802:

> (i) that [the plaintiff] belongs to a racial minority; (ii) that he applied and was
> qualified for a job for which the employer was seeking applicants; (iii) that,
> despite his qualifications, he was rejected; and (iv) that, after his rejection, the
> position remained open and the employer continued to seek applicants from
> persons of complainant's qualifications.

The Plaintiff merely offers a few conclusory statements – none of which make reference to other people similarly situated, of differing national origin, being treated more favorably than he. He fails to provide any factual support to "plausibly suggest an entitlement to relief," as required by *Iqbal* and his Title VII claims should therefore be dismissed. *Id.* at 1951. For example, he claims that he was treated less favorably and subjected to excessive disciplinary suspensions, yet he fails to identify the appropriate discipline he should have been given for his unprofessional behavior and unsatisfactory work performance. He also fails to plead allegations that other employees were subjected to less severe discipline for violation of the same infractions or that employees with the same unsatisfactory performance evaluations received less severe discipline. He also fails to provide any basis for his conclusory claim that he was given a fraudulent rating on his work performance, or that he suffered disparate treatment because Steffen is biased against his accent. He makes no allegation that similarly situated employees outside of the Plaintiff's protected class who were subordinate and threatening received different evaluations or did not suffer similar adverse employment actions. He also makes no allegations that his supervisors were motivated by animus against him due to his national origin.

Chen's Opposition (ECF 22) contains a "Response to Defendants' Statement of Facts." *Id.* at 1-5. He agrees in part and disagrees in part with defendants' statement of facts in the Motion. ECF 15 at 1-6.[17]

I am satisfied that Chen's Amended Complaint (ECF 14) sets forth "enough factual material (taken as true) to suggest" a cognizable cause of action under Title VII. *Twombly*, 550 U.S. at 556.

As noted, defendants rely on *McCleary–Evans*, 780 F.3d 582.   ECF 15-1 at 9. In *McCleary–Evans*, the plaintiff complained that she was not selected for two positions because "decisionmakers were biased and had 'predetermined' that they would select white candidates to fill the positions." *Id* (quoting McCleary-Evans's complaint). The Fourth Circuit affirmed the dismissal of the employment discrimination complaint "[b]ecause . . . McCleary-

---

[17] The Opposition (ECF 22) also reiterates and incorporates contentions advanced in his Summary Judgment Motion. ECF 23. As noted, I denied the Summary Judgment Motion (ECF 23), without prejudice, as premature. ECF 24.

Evans failed to include adequate factual allegations to support a claim that the Highway Administration discriminated against her *because* she was African American or female." 780 F.3d at 583 (emphasis in original).

In contrast, Chen advances specific factual allegations to support his contention that he was the victim of unlawful discrimination because of his national origin. In this regard, Chen alleges that he had a series of combustible encounters with his superiors, who fabricated claims of misconduct and poor performance and gave him unfairly negative performance evaluations and used those fabrications as grounds to terminate his employment. Chen also maintains that he was disproportionately punished with suspensions and ultimately termination. For example, Chen submits, *inter alia*, that other employees used the internet for a variety of personal reasons, yet he alone was denied internet access. *See id.* at 19-20 ¶ 65. Chen also contends that his coworkers were permitted to take extended lunch breaks, whereas he was punished for doing so on one occasion. *See* ECF 14 at 20 ¶ 67.

At this juncture, a court typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards*, 178 F.3d at 243 (quotation marks omitted). Rather the court "must accept as true all of the factual allegations contained in the complaint," and must "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (citations and quotation marks omitted). The sole question here is whether the complaint sets forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted).

In my view, the Amended Complaint (ECF 14) adequately states a claim for wrongful termination under Title VII. Accordingly, I will deny the Motion (ECF 15).

### III. Conclusion

In sum, for the reasons stated, Chen's Amended Complaint states a claim for discrimination under Title VII. Accordingly, the Motion (ECF 15) is denied.

A separate Order follows, consistent with this Memorandum Opinion.

Date: August 29, 2016            /s/

                                 Ellen Lipton Hollander
                                 United States District Judge

- 35 -