YING-JUN CHEN,

    *Plaintiff*,

v.

MARYLAND DEPARTMENT OF
HEALTH AND MENTAL HYGIENE, et al.,

    *Defendants*.

Civil Action No.: ELH-15-01796

## MEMORANDUM OPINION

In this employment discrimination suit, self-represented plaintiff Ying-Jun Chen, who is Chinese-American, filed suit against his former employers, the Maryland Health Care Commission ("MHCC") and the Maryland Department of Health and Mental Hygiene ("MDHMH," "DHMH" or the "Department"),[1] as well as several individuals in their official capacities: the former Secretary of MDHMH, Van T. Mitchell; the Acting Executive Director of MHCC, Michael ("Ben") Steffen; and the Director of Administration for MHCC, Bridget Zombro (collectively, the "Individual Defendants"). *See* ECF 14 ("Amended Complaint").[2]

---

[1] The Maryland Department of Health and Mental Hygiene was renamed in July 2017, and is now known as the Maryland Department of Health. *See* Md. Code (2015, 2017 Supp.), §§ 1-101, 2-101, 2-102 of the General Health Article.

[2] Chen initially filed a Complaint (ECF 1) alleging harassment and discrimination based on his national origin, in violation of Title VII, the Fourteenth Amendment to the U.S. Constitution, and Article 26 of the Maryland Declaration of Rights. *See* ECF 1. By Memorandum Opinion (ECF 12) and Order (ECF 13) of February 17, 2016, I granted defendants' Motion to Dismiss the Complaint (ECF 6), with leave to amend the Title VII claim of discrimination as to MHCC, MDHMH, and the Individual Defendants. Chen subsequently

Chen alleges that MHCC terminated his employment as a result of discrimination based on national origin, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), codified, as amended, at 42 U.S.C. §§ 2000e *et seq.*

Defendants have moved for summary judgment (ECF 48), supported by a memorandum of law (ECF 48-1) (collectively, the "Motion") and many exhibits. *See* ECF 48-3 through ECF 48-21.[3] Chen opposes the Motion (ECF 50, "Opposition") and has also provided multiple exhibits. *See* ECF 50-1 through ECF 50-19. Defendants replied (ECF 51, "Reply") and submitted two additional exhibits. *See* ECF 51-1; ECF 51-2.

The Motion is fully briefed, and no hearing is necessary to resolve it. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion

## I.     Factual and Procedural Background

### A.

Plaintiff was born in China. ECF 14, ¶ 1. He moved to the United States in 1990 to pursue graduate studies (*id.*, ¶ 11) and in 2007 he became a naturalized U.S. citizen. *Id.* ¶ 13. MDHMH is a principal department of the Maryland state government. ECF 14, ¶ 14. MHCC is an independent commission that functions within MDHMH. *Id.* ¶ 16. In December 2009,

---

filed the Amended Complaint. ECF 14. By Memorandum Opinion (ECF 28) and Order (ECF 29) of August 29, 2016, I denied defendants' Motion to Dismiss the Amended Complaint. ECF 15.

[3] Defendants' Motion is far from a model of clarity. Among the deficiencies of the Motion, defendants submit more than 225 pages of exhibits (ECF 48-3 through ECF 48-21) without pin citations to the relevant portions of those exhibits. *See, e.g.*, ECF 48-1 at 4. Additionally, defendants rely on evidence they failed to submit. *See, e.g.*, ECF 48-1 at 13-14 (citing "*Chen Dep. Vol. II. at 198*" but failing to submit page 198 of the deposition transcript).

MHCC hired Chen as a "Health Policy Analyst—Advanced." ECF 48-4, ¶ 2; *see also* ECF 50-1 at 2 (letter from the Chief of MHCC Employment Services to Chen, dated December 10, 2009).

As a "Health Policy Analyst—Advanced," Chen was required, *inter alia*, to conduct "studies on relevant policy issues regarding health care access, utilization and costs using large data files with minimal supervision." ECF 48-5 (plaintiff's Position Description) at 1. Chen acknowledged receipt of his position description. *See* ECF 50-1 at 7 (Certified Receipt of Position Description). He satisfactorily completed the 180-day probationary period on June 16, 2010. ECF 50-2 at 2-3. However, Chen was terminated on January 18, 2012. *See* ECF 52-1 (Notice of Termination). At that time, he was still classified as Health Policy Analyst—Advanced. *See* ECF 52-1 at 2.

During plaintiff's employment, Mitchell was Secretary of MDHMH. ECF 14, ¶ 15. He resigned in December 2016, and was succeeded by Robert R. Neall.[4] Steffen was the Acting Executive Director of the MHCC, and the Director of MHCC's Center for Analysis and Information Services. ECF 14, ¶ 17; *see also* ECF 52-3 at 3-14 (documents attached to plaintiff's Notice of Disciplinary Action, dated November 9, 2011). Zombro is the Director of Administration for MHCC. ECF 48-4 (Zombro Affidavit), ¶ 1; *see also* ECF 52-2 (Memorandum from Zombro to Chen, dated December 7, 2010) at 3.[5] According to Chen, Zombro reports to Steffen. ECF 14, ¶ 18.

_____

[4] Defendants never moved to substitute Neall for Mitchell. *See* Docket. Fed. R. Civ. P. 25(d) states, in pertinent part: "An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded."

[5] Defendants identify Zombro as "MHCC's personnel officer." ECF 48-1 at 7.

While at MHCC, plaintiff had several supervisors, some of whom overlapped. Linda Bartnyska, the Chief of Costs and Quality for MHCC (ECF 52-3 at 10, ¶ 2), was Chen's "immediate supervisor." ECF 14, ¶ 43. Bartnyska supervised plaintiff from at least December 2009 to July 2011. *See* ECF 48-7 (Mid-Cycle PEP Evaluation, dated December 2010); ECF 48-8 (End-of-Cycle PEP Evaluation, dated July 2011); *see also* ECF 48-5 at 1; ECF 52-3 at 10 (memorandum from Zombro to Chen, dated November 3, 2011). It is not clear when, if at any point before Chen's termination, Bartnyska ceased supervising plaintiff.

Norman Ringel began to supervise Chen in January 2011, when Chen was moved from the position of Health Policy Analyst—Advanced to the position of Data Processing Programmer. *See* ECF 48-8 at 5 (unsigned and undated document attached to plaintiff's 2011 End-Of-Cycle PEP Evaluation); *see also* ECF 52-3 at 10.[6] It appears that Ringel ceased supervising plaintiff in June 2011, when Ringel retired from MHCC. *See* ECF 50-13 at 3 (email from Chen to Steffen, dated December 26, 2011).

Leslie LaBrecque is the Chief of Database Development and Applications for the MHCC. *See* ECF 52-3 at 7 (email from LaBrecque to Steffen, dated November 3, 2011). At some point in 2011, LaBrecque also began supervising plaintiff as to his "programming" assignments. ECF 14, ¶ 59; ECF 52-3 at 7.

On September 21, 2010, Zombro wrote a "Memorandum of Verbal Counseling" to Chen, with copies to Steffen and Bartnyska. *See* ECF 48-19 at 1 (Memorandum of Verbal Counseling). The subject line of the memorandum is: "Insubordination." *Id.* In the body of the memorandum, Zombro asserted that Chen had been given an assignment at "the beginning of the year," which

---

[6] Defendants have not provided Ringel's job title.

was due on September 17, 2010, but he failed to complete the assignment by the deadline.  *Id.*

Additionally, Zombro wrote that, "without authorization from Linda Bartnyska or Ben Steffen,"

plaintiff "tried to convince Norm Ringel to create" the assignment, offering Ringel "comp-time"

and the possibility of "part-time work . . . when he retires, neither of which are things [Chen is]

in a position to offer."  *Id.*  Further, Zombro stated that, when Bartnyska told plaintiff that the

assignment was due, plaintiff said "then [Bartnyska] should do it" herself.  *Id.*

Two emails were attached to the Memorandum of Verbal Counseling.  *See* ECF 48-19 at

1-3.  In an email from LaBrecque to Steffen, Bartnyska, Ringel, and Zombro, dated September

17, 2010 (ECF 48-19 at 2), LaBrecque reported that Chen had placed MHCC data on a USB

drive,[7] in violation of MHCC data policy.  *Id.*  According to LaBrecque, Chen also inserted the

USB drive into LaBrecque's computer, causing the computer to crash.  *Id.*  In an email of that

same date from Ringel to Zombro and Steffen (ECF 48-19 at 3), Ringel reported that Chen

"impulsively" connected a USB drive to Ringel's computer.  According to Ringel, Chen said that

"he has numerous [USB] drives on which to back up his files."

On December 2, 2010, Chen and Bartnyska had a verbal altercation that resulted in a

five-day suspension of Chen, from December 8, 2010, through December 15, 2010.  *See* ECF 52-

2 at 3.  According to a memorandum from Bartnyska to Zombro, dated December 2, 2010 (ECF

52-2 at 4-5), when Bartnyska assigned Chen a project on that same date, Chen raised his voice,

leaned across the table towards Bartnyska, and put his face close to hers.  ECF 52-2 at 4.

---

[7] "USB" is an abbreviation for "Universal Serial Bus."  *See Universal Serial Bus (USB)*, TECHOPEDIA (last visited, March 9, 2018), https://www.techopedia.com/definition/2320/universal-serial-bus-usb.

Defendants have submitted statements of several MHCC employees who claim to have witnessed the incident and who corroborate Bartnyska's account. *See* ECF 52-2 at 6-9.[8]

Chen appealed the suspension to Rex Cowdry, then the Executive Director of MHCC. *See* ECF 50-4 at 3-4 (appeal). Chen claimed that he "remained silent when [Bartnyska] started yelling at" him. *Id.* at 3. Moreover, Chen insisted that he "did not yell" at Bartnyska. *Id.* And, in response to Bartnyska's assertion that Chen had leaned across a table towards her, Chen explained that he "bowed down" to her. *Id.*[9] Further, Chen stated that he "had endured [Bartnyska] yelling at least three (3) times." *Id.* And, he asserted that he and Zombro had discussed improving his "2-way communications on future work assignments" to "avoid misunderstandings" with Bartnyska. *Id.*

Cowdry denied the appeal. ECF 50-4 at 2. He concluded that plaintiff failed to present evidence of mitigating circumstances regarding the verbal altercation of December 2, 2010. *Id.*[10]

The MHCC evaluates its employees using the Maryland Performance Planning and Evaluation Program ("PEP"). *See* ECF 48-1 at 4; *see also* 48-6 (revised PEP Guidelines and Instructions, dated October 14, 2010). "The PEP is intended to facilitate communication between employees and supervisors regarding expectations and performance." ECF 48-6 at 1. It

---

[8] Defendants indicate that plaintiff wrote a statement regarding his version of the incident (ECF 52-3 at 3), but neither defendants nor plaintiff provided it to the Court. *See* ECF 53-2 at 1-9.

[9] In his Opposition, plaintiff adds that his bow was intended to signify "regret." ECF 50 at 7, ¶ 4. And, he contends that bowing is "a physical and cultural trait closely associated with his ethnicity." *Id.* at 7, ¶ 5.

[10] According to an email from Cowdry to MHCC staff dated March 28, 2011, Cowdry resigned from the position of Executive Director of MHCC on April 15, 2011. *See* ECF 50-4 at 5-6.

"offers employees and supervisors an opportunity to . . . openly discuss areas for [the employee's] enhancement and improvement. In cases of poor performance it is meant to compliment the disciplinary process by providing a means to assist employees to improve." *Id.*

The PEP process requires an employee to be evaluated by a supervisor at least twice each year, typically in June and December. *See* ECF 48-6 at 1; *see also* ECF 48-1 at 4. PEP evaluations fall into three categories. A "beginning-of-cycle" PEP evaluation, which occurs soon after an employee is hired, requires, *inter alia*, a discussion about "performance expectations for the coming year." *Id.* A "mid-cycle" PEP pertains to "the employee's performance during the first months of the PEP Cycle," and typically occurs in December. *Id.* An "end-of-cycle" evaluation entails a review of "the employee's performance for the entire rating year," and generally occurs in June. *Id.*

Under the PEP framework, an employee is evaluated based on job requirements termed "position-specific performance standards" and "behavioral elements." ECF 48-6 at 2. An employee's supervisor rates the employee on a scale of 1 to 3 for each position-specific performance standard and behavioral element, with 3 being the best. *See, e.g.*, ECF 48-9 (Chen's Decembers 2011 PEP); *see also* ECF 48-6 at 2. The ratings on each "standard" and "element" are then averaged. The average score determines whether the employee receives an overall evaluation of "Outstanding," "Satisfactory," or "Unsatisfactory." ECF 48-6 at 2 (capitals in original); *see also* ECF 48-9. To obtain an overall rating of "Outstanding," the employee must receive an average score within the range of 2.75 to 3.00. *See, e.g.*, ECF 48-9. An overall rating of "Satisfactory" requires an average score within the range of 1.75 to 2.74. *Id.* And, a rating of "Unsatisfactory" falls within the range of 1.00 to 1.74. *Id.*

Notably, if an employee receives an overall rating of "Unsatisfactory" on an end-of-cycle PEP evaluation, "the employee's supervisor shall inform the employee that the employee has <u>180 days to improve to the level of 'Satisfactory.'</u>" ECF 48-6 at 7 (emphasis in original). Moreover, the supervisor and employee must complete a "Performance Improvement Plan" ("PIP") to facilitate the employee's improvement during the "180-day improvement period." *Id.* at 7-8. If the employee fails to earn a "Satisfactory" rating within the 180-day improvement period, the MHCC is required to terminate the employee. *Id.* at 8; *see also* ECF 52-1.

Title Eleven of the State Personnel and Pensions ("S.P.P.") Article of the Maryland Code (2015 Repl. Vol., 2017 Supp.) governs disciplinary actions and termination of employees in the State Personnel Management System, within the Executive Branch of the State government. *See* S.P.P. § 11-102. The Code of Maryland Regulations ("COMAR") provides, in relevant part, 17.04.05.03(G)(1) (emphasis added):[11]

> When an employee has been given an overall rating of "unsatisfactory" on an annual performance appraisal, the employee's supervisor shall inform the employee that the employee has 180 days from issuance of the rating to improve to the level of "satisfactory". . . . *Failure to meet standards at the end of the 180-day period shall result in the employee's termination.*

In the Mid-Cycle PEP Evaluation, dated December 21, 2010 (ECF 48-7, "December 2010 PEP"), plaintiff received an overall rating of "Satisfactory," indicating that he had "[m]et the required and expected results for the job." *Id.* at 1. It was signed by Chen, Zombro, and Bartnyska. *Id.*

---

[11] S.P.P. § 11-111 states, in part: "The Secretary [of the Department of Budget and Management], by regulation, shall establish policies and procedures for disciplinary actions related to employee performance . . . ." *See also Danaher v. Dep't of Labor, Licensing & Regulation*, 148 Md. App. 139, 156-57, 811 A.2d 359, 369-70 (2002).

Zombro avers in her Affidavit: "The Department of Budget and Management implemented a new performance evaluation system during the December 2010 PEP ratings period. MHCC was instructed to rate all employees satisfactory. Mr. Chen would have received an unsatisfactory rating but for the Department of Budget and Management's policy mandating that he be given a satisfactory rating." ECF 48-4, ¶ 3; *see* ECF 48-8 at 5 (unsigned and undated document attached to Chen's July 2011 PEP, stating that the Maryland Department of Budget and Management ("DBM") mandated that "all employees were to be rated Satisfactory" on the December 2010 PEP). No such notation is made on the December 2010 PEP itself. And, defendants provide no documents from the DBM as to the alleged mandate.

In her Affidavit, Zombro asserts that Chen's "deficiencies and poor work performance" in 2010 "related to his failure to check his results before turning in a project, his refusal to follow directions, and his inability to understand and use statistical formulas." ECF 48-4, ¶ 4. Indeed, despite the satisfactory rating, Chen's December 2010 PEP described several "Behavioral/Skill Areas" in which he required improvement, including, ECF 48-7 at 2 (emphasis in original):

1. Working independently—requires/expects unreasonable amount of supervisory attention during implementation of projects.

2. Self checking [sic] results—failure to self-check work adequately before giving to supervisor.

3. Unwillingness to accept Supervisor's decisions—refusals to perform assigned tasks on several occasions; repeatedly questions supervisor's descriptions of assigned tasks; repeatedly questions supervisor's decisions about what is to be included in documents; and repeatedly questions supervisor's decisions regarding editing of text.

4. Ability to understand and use statistical formulas—unable to identify correct standard error formulas from a short chapter describing the formulas and when to use them; uses incorrect formula even when told the correct formula to use.

5. Ability to accurate/clearly [sic] explain analytical results in written text—inaccurate descriptions of analytical results in text for insurance coverage report.

Plaintiff has submitted a document titled "Health Insurance Coverage in Maryland Through 2009." *See* ECF 50-3. Presumably, this is the "insurance coverage report" referenced in the December 2010 PEP. *See* ECF 48-7 at 2, ¶ 5. In his Opposition, Chen points to the insurance coverage report (ECF 48-7) for the proposition that he "had no problem . . . performing relevant job duties." ECF 50 at 6, ¶ 3. The report bears Bartnyska's name. ECF 48-7 at 1. And, it recognizes Chen and Larry Monroe for their contributions to the report. *Id.*; *see also* ECF 50 at 6, ¶ 3.

Zombro avers that in April 2011 Chen was transferred "to a position with a new supervisor" in order to improve his work performance. ECF 48-4, ¶ 5. Zombro stated that Chen's new position required him "to do programming." *Id.* Zombro does not specify the scope of plaintiff's new responsibilities or identify his supervisor. It appears that plaintiff's new position was that of "Data Processing Programmer," and Ringel was his supervisor. *See* ECF 48-8 at 5. However, plaintiff's job title remained unchanged. *See* ECF 52-1 at 2.

On June 23, 2011, the MHCC created a PIP for Chen. *See* ECF 48-13 ("June 2011 PIP"). According to plaintiff's Notice of Termination, Zombro and Ringel issued the June 2011 PIP to plaintiff during a meeting on June 30, 2011. ECF 52-1 at 3. Defendants assert that the June 2011 PIP was "implemented with management to improve upon Chen's 'Unsatisfactory' June 2011 PEP[.]" ECF 48-1 at 9. The June 2011 PIP stated, ECF 48-13 at 2:

This plan will be reviewed monthly, as necessary, to work with Linda/Leslie on areas of difficulty and to note areas of strength. This plan, and any amendments, will be considered for the mid-cycle PEP, to take place on or before December

31st 2011.  The performance under the plan will be reevaluated in 180 days starting July 1, 2011.

The June 2011 PIP identified plaintiff's performance in the following areas as "Needs Work (Unsatisfactory)": "Working independently"; "Self checking results"; "Ability to understand and use statistical formulas"; "Ability to accurately/clearly explain analytical results in written text"; "Demonstrates an increasing knowledge of the MCDB,[12] expertise in its use"; "Prepares at least one technical analysis using the MCDB"; "Reports progress, resolves questions needing decision with supervisor"; "Provides data analysis, text development, and document reviews for the health insurance coverage report"; "Prepares at least one technical analysis using the MCDB or other data in accordance with the approved study and design and timeline."  ECF 48-13 at 1.

A "Special Note" at the end of the PIP stated, in relevant part, *id.* at 2: "Mr. Chen was rated as satisfactory during his mid-term evaluation; it was due to the implement [sic] of a new performance evaluation system. Instruction from DBM were that all employees were to be rated Satisfactory."

In Chen's subsequent PEP Evaluation (ECF 48-8, "June 2011 PEP"), he received an overall evaluation of "Unsatisfactory," based on an assessment of eleven "position-specific performance elements" and nineteen "behavioral elements."  *See id.* at 1-3; *see also* ECF 48-4, ¶ 6.[13]  Chen and Bartnyska signed that PEP on July 6, 2011.  ECF 48-8 at 4.  Zombro and Ringel signed it on July 11, 2011.  *Id.*[14]

_____

[12] The record does not indicate to what "MCDB" refers.

[13]  As indicated, plaintiff was rated on a scale of 1 to 3 for each position-specific performance element and behavioral element, with 3 being the best.  *See* ECF 48-8 at 1-2. Plaintiff's average rating was 1.27 out of 3.  *Id.* at 3; *see also* ECF 48-4, ¶ 6.  According to a

In the June 2011 PEP, Bartnyska and Ringel informed plaintiff of several "Tasks to be Achieved Before the Next Mid-Cycle Rating," including "1. Upgrade communication skills; 2. Become proficient in task assignments . . . 3. Cease printing inappropriate documents; 4. Focus on users specific requests/requirements instead of formulating assumptions about tasks; 5. See mid-year [December 2010 PEP] evaluation areas needing improvement." ECF 48-8 at 4. Additionally, Bartnyska and Ringel suggested that "[c]ourses in communication (written and verbal) may be helpful" to improve Chen's work performance. *Id.*

Numerous documents are attached to the June 2011 PEP. *See* ECF 48-8 at 5-64. They appear to have been collected and/or created by Ringel. *See id.* In a document dated June 13, 2011, titled "Supervisor Comments," Ringel noted that Chen "is prone to go off in his own direction"; "needs improvement in his communication skills"; and struggles to follow directions, take initiative in his work, and is uncooperative with his colleagues. ECF 48-8 at 6-7; *see also* ECF 50-5 at 3-4. However, Ringel also stated that "Chen is an adequate SAS programmer." ECF 48-8 at 6; *see* ECF 50-5 at 3. And, he said that "a review of Chen's assignment sheets shows that SA programs are mostly completed on time. Some projects are completed with minimal supervision and some with closer supervision." ECF 48-8 at 7; *see* ECF 50-5 at 4.

Additional documents attached to the June 2011 PEP include records of email correspondence indicating that Chen failed to follow Ringel's instructions on two occasions

---

rubric contained in the June 2011 PEP, a score of 1.74 or lower qualifies as "Unsatisfactory." ECF 48-8 at 3. Accordingly, plaintiff's overall evaluation was "Unsatisfactory."

[14] Although plaintiff signed the June 2011 PEP on July 6, 2011 (ECF 48-8 at 4), Zombro avers that Chen received a copy of the PEP on June 30, 2011. *See* ECF 48-4, ¶ 6. Moreover, plaintiff's Notice of Termination (ECF 52-1 at 3) indicates that Zombro and Ringel delivered a copy of the June 2011 PEP to Chen on June 30, 2011.

(ECF 48-8 at 10-15), that Chen had a confrontation with a colleague stemming from one of Chen's assignments (*id.* at 17-18), and Chen failed to follow directions from Bartnyska pertaining to the use of certain datasets. *See id.* at 24-25.

On June 30, 2011, Zombro wrote and delivered a memorandum to Chen. *See* ECF 48-12. It stated, in part, *id.*:

> On June 30, 2011 we met to discuss your FY2011 end-of-cycle PEP evaluation [June 2011 PEP]. The end-of-cycle rating is 1.27, Unsatisfactory and you will have 180 days from the issuance of this letter to improve to the level of "Satisfactory." It is important to note that COMAR 17.04.05.03G(1) states: "Failure to meet standards at the end of the 180 day period shall result in the employee's termination["]. . . .

Although the memorandum states that it was delivered to Chen on June 30, 2011, Chen appears to have refused to sign it. *See* ECF 48-12. The portion of the memorandum reserved for Chen's signature contains the words: "Refused to sign as he disagrees with ratings." *Id.* Those words were initialed by "BZ" (*id.*), which presumably refers to Bridget Zombro.

Defendants assert, without pointing to any evidence, that, as a result of plaintiff's June 2011 PEP, the MHCC revoked plaintiff's access to the internet "in order to keep Chen focused on his work." *See* ECF 48-1 at 7. It appears that Zombro met with plaintiff on June 23, 2011, to discuss, *inter alia*, how plaintiff's internet access would be blocked until his PEP performance improved to the level of "Satisfactory." *See* ECF 52-3 at 9 (memorandum from Zombro to Chen, dated November 3, 2011), ¶ 1; *see also* ECF 52-3 at 6 (email from Zombro to Steffen, dated November 3, 2011); ECF 52-3 at 7 (email from LaBrecque to Steffen, dated November 3, 2011).

In emails dated July 21, 2011, between, *inter alia*, LaBrecque and Zombro (ECF 50-7 at 2), LaBrecque suggested that Chen was using a "stand-alone" printer with access to the internet to print "non-work related matter" from the internet. *Id.* LaBrecque stated that Chen's purported

actions "ought to be a fire-able-offense since he was instructed verbatim not to print any non-work related internet documents." *Id.* Zombro responded, "In. Subordination [sic] I will deal with it . . . ." *Id.*; *see also id.* at 4 (email from LaBrecque to Zombro and Bartnyska, dated July 29, 2011).

In a memorandum from Zombro to Chen dated November 3, 2011, Zombro stated that on October 28, 2011, plaintiff left the MHCC building for three hours, without permission. *See* ECF 52-3 at 11, ¶ 5. Zombro characterized this as "Unauthorized Leave" and stated that plaintiff had been "AWOL" for three hours. *Id.* Zombro changed plaintiff's timesheet to reflect the unauthorized leave, and informed plaintiff that he would not be paid for that time. ECF 50-10 at 3. In an email to Steffen, Chen referred to the three hour absence as an "extended lunch break." ECF 52-3 at 13.

In an email from LaBrecque to Steffen, dated November 3, 2011, LaBrecque stated that she observed plaintiff using the internet on October 26, 2011. *See* ECF 52-3 at 7; *see also* ECF 52-3 at 10, ¶ 1. As noted, Zombro had removed plaintiff's access to the internet on June 23, 2011. *See id.*; *see also* ECF 52-3 at 9. LaBrecque discovered that plaintiff's internet access had been automatically restored as a result of a power outage in the MHCC building. ECF 52-3 at 7; *see also* ECF 52-3 at 9.

According to an email from Zombro to Steffen dated November 3, 2011 (ECF 52-3 at 6), Zombro and LaBrecque met with plaintiff on November 2, 2011, to discuss his unauthorized use of the internet, his June 2011 PIP, and his "work attitude." *Id.* Zombro recounted that, during the meeting, plaintiff repeatedly raised his voice, rolled his eyes, laughed inappropriately, and interrupted Zombro. *Id.* Zombro also averred that Chen threatened to "go to the Secretary" if

MHCC did not restore his internet access. *Id.* Chen acknowledged only that he was "very upset" during the meeting. *See* ECF 50 at 9, ¶ 12. In an unsigned memorandum from Zombro to Chen dated November 3, 2011 (ECF 52-3 at 9-11), Zombro noted that Chen's access to the internet had again been rescinded. *Id.* at 9.

Steffen emailed Chen on November 4, 2011 (ECF 50-10 at 2), asking Chen to "provide a written description" of the meeting with Zombro and LaBrecque on December 2, 2011. Chen responded on that same date, stating, *id.*:

1. I would like to apologize for being emotional in conversation with Bridget [Zombro] (I still think that they've been coming too hard on me, unbearable at times);
2. I have abided, and will continue to abide, all the provisions of the MHCC's Telecommunication Usage Agreements;
3. I did not "mock" anybody, nor "threaten" anything;
4. I have been using the internet uninterrupted to complete my assignments, including the recent download and processing of CPS/ASEC survey data and updates;
5. I have completed all my assignments on time with prudence, efficiency, and professionalism; And [sic]
6. I shall continue working hard on improving my communication skills; . . . .

In a memorandum dated November 8, 2011, from Steffen to Janet Nugent, Director of Personnel for the DHMH (ECF 52-3 at 3), Steffen stated that on November 7, 2011, he "held a mitigating circumstances meeting" with Chen, in which Steffen reviewed plaintiff's version of facts regarding the meeting between Chen, Zombro, and LaBrecque on December 2, 2011.[15] According to Steffen, plaintiff expressed contrition during the "mitigating circumstances meeting" of November 7, 2011. ECF 52-3 at 3. Nonetheless, by memorandum dated November 8, 2011 (ECF 52-3 at 12), Steffen informed Chen that, as punishment for Chen's behavior during

---

[15] Plaintiff contends in his Opposition, without directing the Court to any evidence, that "Steffen did not meet with Chen on November 7, 2011." ECF 50 at 10, ¶ 13.

- 15 -

the meeting of November 2, 2011, Chen would receive a ten-day suspension, without pay, from November 9, 2011, through November 22, 2011. *Id.*; *see also id.* at 2, 12. Steffen instructed plaintiff to return to work on Monday, November 28, 2011. *Id.*[16] According to Bartnyska, Chen was escorted from the MHCC building on the morning of November 9, 2011. *See* ECF 52-4 at 4-5 (memorandum from Bartnyska to Steffen, dated November 10, 2011); *see also* ECF 50-11 at 2-3 (same).

Defendants state that plaintiff did not file a grievance challenging the ten-day suspension. *See* ECF 48-1 at 8.[17] However, plaintiff emailed Steffen on November 14, 2011, asking for Steffen to reconsider the suspension. *See* ECF 52-3 at 13-14; ECF 50-12 at 10-11. And, by letter of December 12, 2011 (ECF 50-12 at 2-7), an attorney for plaintiff wrote to Joshua Sharfstein, M.D., then the Secretary of MDHMH, arguing that the duration of the suspension violated the DHMH Employee Relations Guidelines. *Id.* at 7. The parties did not submit evidence pertaining to the resolution of that challenge.

In the early evening of November 9, 2011, the first day of the ten-day suspension, Chen returned to the MHCC building, without permission. *See* ECF 52-4 at 3 (email from Steffen to Zombro, dated November 16, 2011). According to an email from Steffen to Zombro, plaintiff

_____

[16] Because MHCC was closed on November 23, 24, and 25, 2011, plaintiff returned to work on November 28, 2011. *See* ECF 52-3 at 12.

[17] *See* COMAR 17.04.06.01(B) ("[T]he State Personnel Management System grievance procedure consists of the three steps specified in State Personnel and Pensions Article, § 12-201, Annotated Code of Maryland."); S.P.P. § 12-201(a)(1) ("[T]he three steps available to a grievant in the grievance procedure are: (i) Step One: the initiation of a grievance procedure; (ii) Step Two: an appeal to the head of the principal unit; and (iii) Step Three: an appeal to the Secretary.").

arrived at the MHCC building at approximately 5:15 p.m. *Id.* According to Bartnyska, Chen arrived at approximately 6:15 p.m. *See* ECF 52-4 at 4-5.

Bartnyska averred that, as she was leaving work on November 9, 2011, she encountered Chen in the MHCC parking lot. *Id.* at 4. According to Bartnyska, Chen ran towards her "calling out loudly, 'Linda, I want to talk to you.'" *Id.* Bartnyska claimed she felt frightened, and yelled to plaintiff that she did not want to speak with him. *Id.* In a moment of "panic," she "turned and ran back to the [MHCC] building." *Id.* Chen followed her into the building. *Id.* Bartnyska then fled to her car, where she used her cell phone to alert Zombro about the incident. *Id.*

In the meantime, plaintiff made his way to Steffen's office. ECF 52-4 at 3; *see also* ECF 52-4 at 4-5. In an email from Steffen to Zombro dated November 16, 2011, Steffen wrote, ECF 50-12 at 12:

> Mr. Chen appeared in my office and requested a meeting. The meeting was unexpected and I stated to the Mr. Chen [sic] that he was on a 2-week suspension. I told Mr. Chen that he had to leave. Mr. Chen stated he just needed to provide a few facts. I told him to sit down as he was polite, but quite agitated.
>
> Mr. Chen reviewed the facts of his case with me, Mr. Chen stated that he had talked with the Chief Counsel at DHMH. I asked him at that point to leave as I viewed the reference to the 'General Counsel' as an attempt to intimidate. Mr. Chen continued, he stated that the meeting on November 2nd was not a performance counseling meeting, he had not been informed of the nature of the meeting and therefore it was a discussion behind closed doors with his supervisor. I told him a decision had been made consistent with state personnel policy.
>
> Mr. Chen requested that Mr. David Sharp,[18] be called to mediate, because he had a language problem. He stated that I said at staff meeting that David Sharp would mediate personnel issues where language problems were the issue. I have no recollection of ever suggesting this odd protocol. I told him, for the third time that he had to leave and that any further communication during the 2-week suspension period must be in writing or via email. I told in the strongest terms, that he must leave immediately. Mr. Chen left the building.

_____

[18] The record does not identify Sharp or indicate in what capacity he works.

Mr. Chen['s] behavior disrupted the work at the MHCC on November 9th. Only after the 3rd request did Mr. Chen leave the building. His unexpected appearance at the building was alarming and violated the condition of his 2-week suspension. After he left, I instructed all employees to depart for the evening. I closed and locked the offices at approximately 6:15 PM after confirming that no one remained inside.

On November 29, 2011, Chen received a Notice of Disciplinary Action (ECF 52-4 at 2), stating that, in response to the incident of November 9, 2011, he was receiving a fifteen-day suspension, from November 30, 2011 to December 20, 2011. *See id.* at 6. In a memorandum from Steffen to Chen dated November 29, 2011 (ECF 52-4 at 6), Steffen instructed Chen to return to work on December 21, 2011.

By letter of December 12, 2011, an attorney for plaintiff asked Sharfstein to lift the fifteen-day suspension because it was "lacking both a legal and factual basis . . . ." *See* ECF 50-12 at 3; *see also id.* 2-7. Based on the record provided to the Court, it is not apparent what action, if any, Sharfstein took.

Chen received a third PEP Evaluation on December 21, 2011. *See* ECF 50-13 at 2 (email from Chen to Steffen dated December 26, 2011); *see also* ECF 48-9 ("December 2011 PEP"). Zombro and LaBrecque signed the PEP on December 21, 2011 (ECF 48-9 at 4), and Chen signed it on December 28, 2011. *Id.* Next to plaintiff's signature is the following: "With disagreements" and "sent home on administrative leave." *Id.* It is not clear who wrote those words.

The December 2011 PEP reflects that Chen was evaluated on three position-specific performance elements, and he received a rating of "Unsatisfactory" for each one. *Id.*[19] Additionally, Chen was evaluated on twenty behavioral elements. *Id.* at 2. As to seven of them, Chen received an evaluation of "Satisfactory." *Id.* But, he received an evaluation of "Unsatisfactory" in thirteen of them. *Id.* Notably, plaintiff received a rating of "Unsatisfactory" in the behavioral elements of "Speaks effectively," "Writes effectively (clear, organized, appropriate grammar, punctuation)," and "interacts positively with co-workers." *Id.* Taking the position-specific performance elements and behavioral elements together, plaintiff received an overall evaluation level of "Unsatisfactory." *Id.* at 3.[20]

In the December 2011 PEP, LaBrecque left blank the portion dedicated to "Tasks to be Achieved Before the Next Mid-Cycle Rating." ECF 48-9 at 4 (capitals in original). However, in the portion of the PEP for "Training Recommendations," LaBrecque wrote, *id.*: "Need better communication skills. Chen does not understand the tasks we are asking of him. Language seems to a [sic] barrier." Additionally, in the portion of the PEP pertaining to the "Supervisor's Comments," LaBrecque stated, *id.*:

> Mr. Chen does adequate work when given highly structured and annotated instructions. He has worked well with Madeline on very straightforward data processing tasks that she clearly lays out. However, if given more than 1 assignment or a task [that] is more complex, Mr. Chen creates numerous diversions as to why the work can't be done, most of which I can't understand. When asked to work with others collaboratively he is at times extremely rude. When attempting to provide him constructive guidance in getting his work done,

---

[19] Plaintiff received an evaluation of 1—the poorest rating—in each of the three position specific performance elements. *See* ECF 48-9 at 1, 3.

[20] As noted, a cumulative evaluation ranging from 1 to 1.74 is "Unsatisfactory." Plaintiff's overall score was 1.30. *See* ECF 48-9 at 3. Therefore, plaintiff was rated as "Unsatisfactory" on the December 2011 PEP.

he has a difficult time listening. He attends meetings but ignores everyone and reads papers while in attendance. Chen expends enormous time on the internet even though those [. . . .[21]]

By email dated December 26, 2011 (ECF 50-13 at 2-4), plaintiff contested the December 2011 PEP. He maintained, *inter alia*, that he "deserve[d] a better than Satisfactory <u>Overall Work Quality</u> rating" on several assignments completed during 2011. *See id.* at 2-3 (emphasis in original). Chen also stated that he had performed multiple programming duties "to the satisfaction of the end users." *Id.* at 3.

Chen was terminated on January 18, 2012. *See* ECF 48-1 at 10; *see also* ECF 52-1 at 4. According to the Notice of Termination (ECF 52-1, "Notice"), the termination was mandatory under COMAR 17.04.05.03(G)(1), because Chen had received consecutive "Unsatisfactory" PEPs in June and December 2011. *See* ECF 52-1 at 2-3. The Notice also said that Chen received an evaluation of "unsatisfactory" on the December 2011 PEP "[a]s a result of work performance issues and multiple occurrences of inappropriate behavior in the work place." *Id.* at 3. In addition, the Notice recounted that Chen had been suspended three times due to his "inappropriate and unprofessional behavior in the work place." *Id.* Further, it stated that Chen had been "abusing the [MHCC] internet policy" and that he lost "internet privileges" in order to "improve his work performance." *Id.* at 3.

In conclusion, the Notice stated, *id.* at 4: "After considering Mr. Chen's overall unsatisfactory performance evaluations and his employment record, mitigating circumstances and adhering to COMAR 17.04.05.03(G)[1], which states, failure to meet standards at the end of

---

[21] The text in this portion of the December 2011 PEP ends mid-sentence. *See* ECF 48-9 at 4.

the 180-day period shall result in the employee's termination, management has no other alternative but termination is deemed the appropriate action."

## B.

As discussed in the Memorandum Opinion of February 17, 2016 (ECF 12), Chen has twice litigated allegations pertaining to his suspensions and his termination. *See Dep't of Health and Mental Hygiene, et al. v. Chen*, No. 909, Sept. Term 2013 (filed July 11, 2014), *cert. denied*, 440 Md. 225, 101 A.3d 1063 (2014) ("*Chen I*"); *Chen v. Maryland Dep't of Health & Mental Hygiene*, No. 696, Sept. Term 2013, 223 Md. App. 770 (June 10, 2015), *cert. denied*, 445 Md. 5, 122 A.3d 975 (2015) ("*Chen II*").[22]

In *Chen I*, plaintiff challenged his termination and the December 2011 PEP. *See* ECF 12 at 12. The Maryland Office of Administrative Hearings ("OAH") concluded, *inter alia*, that DHMH's termination violated COMAR 17.04.05.03(C)(4), which, in relevant part, requires the State to "inform the employee of the effective date of the disciplinary action." ECF 12 at 12 (citing ECF 1-19 at 15-16). The DHMH sought judicial review in the Circuit Court for Baltimore City, which affirmed the OAH. *Id.* at 13 (citing ECF 1-26 at 2-3, 9). DHMH appealed to the Court of Special Appeals, which reversed. It concluded, *inter alia*, that DHMH terminated Chen in compliance with COMAR 17.04.05.03(G). *See Chen I* at 12-13.

In *Chen II*, plaintiff litigated challenges to his ten- and fifteen-day suspensions. ECF 12 at 13. The OAH upheld both suspensions, and the Circuit Court for Baltimore City affirmed.

_____

[22] Although defendants assert res judicata, they did not provide the Court with the decisions of the Maryland Court of Special Appeals. *Chen I* is not reported and *Chen II* is not reported in A.3d. I note that both appeals were filed in 2013 and assigned to different appellate panels. Based on the appeal numbers, it appears that the appeal in *Chen II* was filed before the appeal in *Chen I*. However, *Chen I* was decided first.

*Chen II*, 223 Md. App. at *2.  In the Court of Special Appeals, Chen argued that his suspensions had been "procedurally deficient" and were "arbitrary and capricious."  *Id.* at *1.  The Court of Special Appeals disagreed, concluding that DHMH followed the appropriate procedures in suspending Chen.  *Id.*  Of relevance here, the appellate court also determined that the findings of the OAH "were amply supported by the evidence . . . ."  *Id.* at *1, 5-7.

On November 13, 2012, before either appellate decision was issued, Chen filed a Charge of Discrimination ("Charge") with the Maryland Commission on Civil Rights ("Maryland Commission").  ECF 52-5.[23]  Plaintiff named only MHCC as his "employer."  *See id.*

On the Charge form, in answer to the query "DISCIMINATION BASED ON," plaintiff checked only the box for national origin.  *Id.* (capitals in original).  Additionally, in response to the query "DATE(S) DISCRIMINATION TOOK PLACE," Chen stated that the "Earliest" and "Latest" date of discrimination was the date of his termination on January 18, 2012.  *Id.* (capitals in original).  And, in the portion of the form pertaining to the "PARTICULARS" of his claim, plaintiff stated, *id.* (capitals in original):

I.  I began my employment with the above-mentioned employer on December 9, 2009, in the position of Health Policy Analyst Advanced under Ms. Linda Barthyska [sic], Chief.  On January 18, 2012, I was discharged by Mr. Ben Stetter [sic], Acting Executive Director.

II.  The reason given for my discharge was due to "inappropriate and unprofessional behavior" and "unsatisfactory work performance."

---

[23]  The Commission was previously known as the Maryland Commission on Human Relations.  During the 2011 legislative session, the Maryland General Assembly approved a change in the name; it is now known as the Commission on Civil Rights.  *See* 2011 Md. Laws, Chap. 580; *see also Bd. of Directors of Cameron Grove Condo., II v. State Comm'n on Human Relations*, 431 Md. 61, 64 n.3, 63 A.3d 1064, 1066 n.3 (2013).

III.    I believe I was discriminated against based on my national origin (Chinese) in violation of Title VII of the Civil Rights Act of 1964, as amended, with respect to discharge.

By letter of March 31, 2015, and the "Dismissal and Notice of Rights" of the same date,

the EEOC notified Chen of the dismissal of his Charge. *See* ECF 1-33.[24] Suit followed on June

18, 2015. *See* ECF 1.

Additional facts are included in the Discussion.

## II.    Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is

appropriate only "if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S.

317, 322–24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238

(4th Cir. 2017). The non-moving party must demonstrate that there are disputes of material fact

so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus.

Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat a summary

judgment motion. "By its very terms, this standard provides that the mere existence of *some*

alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no *genuine* issue of *material*

fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A

fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

---

[24] The parties did not submit the EEOC's Dismissal and Notice of Rights as an exhibit to the Motion or Opposition, but it was submitted with the suit. *See* ECF 1-33.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. As indicated, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *accord Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir.

2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

However, to defeat summary judgment, conflicting evidence must give rise to a *genuine* dispute of material fact. *Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Sharif v. United Airlines, Inc.*, 841 F.3d at 204. Conversely, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

In sum, to avoid summary judgment, there must be a genuine dispute as to material fact. In *Iraq Middle Mkt. Dev. Found.*, 848 F.3d at 238, the Court reiterated: "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."

### III. Discussion

### A. Res Judicata

Defendants argue that Chen's Title VII claim is barred by the doctrine of res judicata. *See* ECF 48-1 at 19-20. Plaintiff disagrees. *See* ECF 50 at 33.

Res judicata, or claim preclusion, is a judicial doctrine by which "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Montana v. United States*, 440 U.S. 147, 153 (1979); *see Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 161 (4th Cir. 2008). The doctrine precludes parties from "contesting matters that they have had a full and fair opportunity to litigate," thereby conserving judicial resources and minimizing the possibility of inconsistent decisions. *Montana*, 440 U.S. at 153-54.

The doctrine of res judicata was "designed to protect 'litigants from the burden of relitigating an identical issue with the same party or his privy and [to promote] judicial economy by preventing needless litigation.'" *Laurel Sand & Gravel*, 519 F.3d at 161-62 (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)); *see also deLeon v. Slear*, 328 Md. 569, 580, 616 A.2d 380, 385 (1992). Res judicata also extends to claims that could have been asserted and litigated in the original suit. *Clodfelter v. Republic of Sudan*, 720 F.3d 199, 210 (4th Cir. 2013); *see also FWB Bank v. Richman*, 354 Md. 472, 493, 731 A.2d 916, 927 (1999).

The applicable law for purposes of claim preclusion in federal court is the law of the tribunal in which the prior judgment was entered. *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984); *accord Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005). The Fourth Circuit has said: "Generally, the preclusive effect of a judgment rendered in state court is determined by the law of the state in which the judgment was rendered." *Laurel Sand & Gravel, Inc.*, 519 F.3d at 162; *accord Jones v. HSBC Bank USA, N.A.*, 444 F. App'x 640, 643 (4th Cir. 2011) (per curiam); *Clodfelter*, 720 F.3d at 210.

The doctrine of res judicata applies when the following three elements are present: "(1) a final judgment on the merits in a prior suit, (2) an identity of the cause of action in both the earlier and later suit, and (3) an identity of parties or their privies in the two suits." *Clodfelter*, 720 F.3d at 210 (citation and quotation marks omitted); *see Weiner v. Fort*, 197 F. App'x 261, 264 (4th Cir. 2006); *In re Varat Enterprises, Inc.*, 81 F.3d 1310, 1315 (4th Cir. 1996) ("[C]laim preclusion occurs when three conditions are satisfied: 1) the prior judgment was final and on the merits, and rendered by a court of competent jurisdiction in accordance with the requirements of due process; 2) the parties are identical, or in privity, in the two actions; and, 3) the claims in the second matter are based upon the same cause of action involved in the earlier proceeding."); *Young–Henderson v. Spartanberg Area Mental Health Ctr.*, 945 F.2d 770, 773 (4th Cir. 1991) (quoting *Nash Cty. Bd. of Educ. v. Biltmore Co.*, 640 F.2d 484, 486 (4th Cir. 1981)); *see also Cochran v. Griffith Energy Servs., Inc.*, 426 Md. 134, 140, 43 A.3d 999, 1002 (2012) ("(1) the parties in the present litigation are the same or in privity with the parties to the earlier litigation; (2) the claim presented in the current action is identical to that determined or that which could have been raised and determined in the prior litigation; and (3) there was a final judgment on the merits in the prior litigation."); *accord Powell v. Breslin*, 430 Md. 52, 63-64, 59 A.3d 531, 538 (2013); *deLeon*, 328 Md. at 580, 616 A.2d 380;

For the purposes of res judicata, privity exists between parties when they are "so identified in interest . . . that [they] represent the same legal right in respect to the subject matter involved." *Martin v. Am. Bancorporation Ret. Plan*, 407 F.3d 643, 651 (4th Cir. 2005). Moreover, "[p]rivity exists where a plaintiff attempts to relitigate the same claim by naming different governmental entities and employees as defendants." *Kayzakian v. Buck*, 865 F.2d

1258 (Table), at *2 (4th Cir. 1988) (per curiam) (citing *Mears v. Town of Oxford, Md.*, 762 F.2d 368, 371 n.3 (4th Cir. 1985)).

A cause of action is "identical" for purposes of res judicata if it "involves a right arising out of the same transaction or series of connected transactions that gave rise to the claims in the first action." *Harnett v. Billman*, 800 F.2d 1308, 1314 (4th Cir. 1986); *see Clodfelter*, 720 F.3d at 210 ("[W]e follow the 'transactional' approach when considering whether causes of action are identical: 'As long as the second suit 'arises out of the same transaction or series of transactions as the claim resolved by the prior judgment,' the first suit will have preclusive effect.'") (citation omitted); *In re Varat Enterprises, Inc.*, 81 F.3d at 1316. Notably, "[u]nder this transactional approach, res judicata will bar a 'newly articulated claim[]' if it is based on the same underlying transaction and could have been brought in the earlier action." *Clodfelter*, 720 F.3d at 210 (citing *Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 162 (4th Cir. 2008)). And, "[a] plaintiff's invocation of a different legal theory in the subsequent action" does not preclude application of res judicata. *Onawola v. Johns Hopkins Univ.*, AMD-07-870, 2007 WL 5428683, at *1 (D. Md. Sept. 24, 2007); *see* RESTATEMENT (SECOND) OF JUDGMENTS § 24(2) cmt. c (1982).

This is not the first time the Court has considered whether res judicata precludes plaintiff's Title VII claim. By Memorandum Opinion of February 17, 2016 (ECF 12), I concluded that res judicata did not bar plaintiff's Title VII claim, because he could not litigate that claim in connection with the administrative challenge to his termination. *See* ECF 12 at 39-40. I stated, in part, *id.* at 39-40:

> *Chen I* involved an appeal from an [Administrative Law Judge's ("ALJ")] determination that DHMH's termination procedure had violated COMAR

17.04.05.03(C)(4). *Chen II* involved an appeal from an ALJ's determination that DHMH had complied with relevant State procedures when it issued Chen a ten-day and a fifteen-day suspension. The Maryland Court of Special Appeals has explained, *Roane v. Maryland Bd. of Physicians*, 213 Md. App. 619, 630, 75 A.3d 344, 351 (2013), *cert. denied*, 436 Md. 329 (2013):

> The scope of judicial review of agency decisions is defined by the Administrative Procedure Act, Md. Code (1984, 2009 Repl. Vol.), § 10–201 *et seq.* of the State Government Article ('SG').[1] Within that framework, our review is well defined and, for the most part, quite limited: we look through the circuit court's review to the agency decision itself and determine whether there is substantial evidence in the record as a whole to support the agency's findings and conclusions.

> Given the limitations of judicial review under Maryland's Administrative Procedure Act, Md. Code (2014 Repl. Vol., 2015 Supp.), § 10-201 *et seq.* of the State Government Article, plaintiff had no opportunity in those proceedings to bring a claim for employment discrimination under Title VII.

In the Motion, defendants argue, *inter alia*, that plaintiff "could have raised discrimination as a basis for arguing why his discipline and termination were unlawful." ECF 48-1 at 20. Relying on *Chism v. Department of Public Safety & Correctional Services*, RDB-04-220, 2004 WL 3568000, at *5 (D. Md. July 23, 2004), *aff'd*, 117 F. App'x 260 (4th Cir. 2004) (per curiam), they argue, ECF 48-1 at 20: "When an employee utilizes an employee grievance process, and the administrative decisions in that process are judicially reviewed, the decisions have preclusive effect in subsequent litigation between the same parties, including Title VII cases, concerning the adverse employment action that was the subject of the administrative action."

In *Chism*, 2004 WL 3568000, the court considered a Title VII claim of race discrimination in regard to the decision of the plaintiff's employer, the Maryland Department of Public Safety and Correctional Services, to deny a request to reclassify plaintiff's position. *Id.* at

*1.  The plaintiff, who was African-American, filed a grievance that was heard by OAH.  He argued that he was denied reclassification while a similarly situated Caucasian was granted reclassification.  *Id.* at *1-2.  The OAH denied and dismissed the grievance.  The circuit court upheld the decision of the OAH, concluding that the denial of the reclassification "was not discriminatory." *Id.* at *2.  The plaintiff then filed suit in federal court under Title VII.  *Id.* at *2-3.  Because the claim of race discrimination had been raised and decided by the circuit court, the federal court concluded that res judicata barred that claim.  *Id.* at 5-6.

Here, there is no indication that the OAH, which reviewed Chen's termination, *Chen I*, No. 909, at *5, and his suspensions, *Chen II*, 223 Md. App. at *2, considered a claim of discrimination based on national origin.  Notably, defendants offer no authority to support the claim that, in the context of the grievances at issue, Chen could have raised a claim of discrimination.[25]

In this regard, defendants In do not address the scope of review under the Maryland Administrative Procedure Act, Md. Code (1984, 2009 Repl. Vol.), § 10-201 *et seq.* of the State Government Article.  *Chen I* and *Chen II* involved procedural challenges to plaintiff's suspensions and termination.  Specifically, *Chen I* stemmed from an OAH decision pertaining to plaintiff's termination under COMAR 17.04.05.03(C)(4).  And, *Chen II* involved an OAH determination that DHMH complied with Maryland procedures when it issued a ten-day suspension and a fifteen-day suspension.

---

[25] The Maryland Commission on Civil Rights is the State agency in which claims of discrimination are lodged and reviewed.  *See, e.g.*, *Dewitt v. Clean Harbors Envtl. Servs., Inc.*, RDB-16-1705, 2017 WL 3116609, at *3 (D. Md. July 21, 2017).

Accordingly, on the record before me, I cannot conclude that plaintiff had an opportunity to raise a claim of discrimination based on national origin when he challenged his suspensions and his termination. *See* ECF 12 at 39-40. Therefore, I am unable to conclude that plaintiff's Title VII claim of discrimination, based on national origin, is barred by res judicata.

## B. Title VII

### 1. Generally

Title VII prohibits a covered employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *see Green v. Brennan*, ___ U.S. ___, 136 S. Ct. 1769, 1773-74 (2016) ("Title VII . . . prohibits employers from discriminating on the basis of race, color, religion, sex, or national origin, or retaliating against their employees for opposing or seeking relief from such discrimination."); *see also Young v. United Parcel Service, Inc.*, ____ U.S. ____, 135 S. Ct. 1338, 1344 (2015); *DeMasters v. Carilion Clinic, et al.*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal–Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).

Title VII states: "Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m). The "intentional discrimination provision [of Title VII] prohibits certain *motives*, regardless of the state of the actor's knowledge." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, ____U.S. ____, 135 S. Ct.

2028, 2033 (2015) (emphasis in original). In other words, an employer who acts with a discriminatory *motive* violates Title VII's prohibition against intentional discrimination. If "an employer offers a facially legitimate reason for its decision," but the plaintiff can show that the employer's "explanation was just a pretext for discrimination," then the employer is liable under Title VII. *Ricci v. DeStefano*, 557 U.S. 557, 596 (2009)

In order to prevail under Title VII, "the existence of some adverse employment action is required." *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Single acts that may not be cognizable as adverse actions on their own may, over time, cumulatively amount to an unlawful employment practice where they create a hostile work environment. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Hoyle*, 650 F.3d at 333-34.

### 2. Administrative Exhaustion

Defendants argue that Chen's EEOC Charge of Discrimination "failed to identify" Mitchell, Steffen, and Zombro, "in their official capacity." ECF 48-1 at 21. Therefore, they contend that Chen cannot maintain a Title VII claim against the Individual Defendants in their official capacity. ECF 48-1 at 21. It does not appear that plaintiff responded to this argument. *See* ECF 50.

Under Title VII, a plaintiff must file a charge with the EEOC or the appropriate state commission before filing suit in federal court. 42 U.S.C. § 2000e–5(f)(1); *See Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009).[26] This "exhaustion requirement ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible." *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005); *see also Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 670 (4th Cir. 2015) ("We recognize that a primary objective of exhaustion requirements is to put parties on notice of the allegations against them.").

The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Institution*, 429 F.3d 505, 510 (4th Cir. 2005). Rather, together with the agency investigation and settlement process it initiates, the requirement "'reflects a congressional intent to use administrative conciliation as the primary means of handling claims, thereby encouraging quicker, less formal, and less expensive resolution of disputes.'" *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013) (quoting *Chris v. Tenet*, 221 F.3d 648, 653 (4th Cir. 2000)). "Allowing [the EEOC] first crack at these cases respects Congress's intent . . . ." *Sydnor v. Fairfax Cty.*, 681 F.3d 591, 593 (4th Cir. 2012).

The exhaustion requirement of Title VII functions as a jurisdictional bar in federal court. In *Balas*, 711 F.3d at 406, the Court said: "[F]ederal courts lack subject matter jurisdiction over

---

[26] Ordinarily, an aggrieved person must file a complaint with the EEOC within 180 days of the alleged discrimination. However, when state law bars the alleged employment practice and the charge is initially filed with a state agency, the state is a "deferral" jurisdiction, and the period for filing is extended to 300 days. *See* 42 U.S.C. § 2000e-5(e)(1); *Jones*, 551 F.3d at 300; *Edelman v. Lynchburg Coll.*, 300 F.3d 400, 404 & n.3 (4th Cir. 2002). Maryland is a deferral state; the Maryland Commission is the applicable State enforcement agency. *See, e.g.*, *Dewitt*, 2017 WL 3116609, at *3.

Title VII claims for which a plaintiff has failed to exhaust administrative remedies." *See also Jones*, 551 F.3d 300.  When an aggrieved party fails to comply with the applicable administrative procedure, he has failed to exhaust his administrative remedies, and failure to comply generally mandates dismissal of a suit.  *See, e.g.*, *Balas*, 711 F.3d at 407; *Miles*, 429 F.3d at 491; *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002).

Even when a plaintiff has filed a charge with the EEOC or the appropriate state commission, a court cannot consider matters that were not properly raised during the EEOC process.  To determine whether a plaintiff has "properly alleged [a claim] before the EEOC" in a manner satisfying the exhaustion requirement, courts "may look only to the charge filed with that agency."  *Balas*, 711 F.3d at 408; *see also Chacko*, 429 F.3d at 506 ("This charge frames the scope of future litigation."); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir. 1996) ("The allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint.").  Although courts "recognize that EEOC charges often are not completed by lawyers and as such must be construed with utmost liberality," courts are "not at liberty to read into administrative charges allegations they do not contain."  *Balas*, 711 F.3d at 408 (citations and quotation marks omitted).  Rather, a court is constrained by the four corners of the charge and the inference of "'any charges that would naturally have arisen from an investigation thereof . . . .'"  *Id.* at 407-08 (citations omitted).

Ordinarily, suit under Title VII may be brought "only 'against the respondent named in the [administrative] charge.'"  *Alvarado v. Bd. of Tr's of Montgomery Cmty. Coll.*, 848 F.2d 457, 458 (4th Cir. 1988) (quoting 42 U.S.C. § 2000e-5(f)(1)).  However, the Fourth Circuit has

recognized that there are circumstances when the naming requirement is not strictly enforced with regard to an official capacity suit. *Alvarado*, 848 F.2d at 460-61; *see also Causey v. Balog*, 162 F.3d 795, 800 n.1 (4th Cir. 1998).

The purpose of the naming requirement is twofold. "First, it notifies the charged party of the asserted violation. Secondly, it brings the charged party before the EEOC and permits effectuation of the Act's primary goal, the securing of voluntary compliance with the law." *Alvarado*, 848 F.2d at 458-59. Thus, it is "designed to provide notice to the charged party and to permit the EEOC to attempt voluntary conciliation of complaints." *Id.* at 460.

Defendants rely on *Alvarado*, 848 F.2d 457, and *Causey*, 162 F.3d 795, to argue that Chen's Title VII claim must be dismissed as to Mitchell, Steffen, and Zombro in their official capacities because Chen did not name them in the Charge. *See* ECF 48-1 at 21. Defendants' reliance on *Alvarado*, 848 F.2d 457, and *Causey*, 162 F.3d 795, is puzzling.

The plaintiff in *Alvarado*, 848 F.2d 457, initially filed an EEOC charge of discrimination that named "Montgomery Community College" as the respondent. *Id.* at 459. However, in the civil suit later filed in federal court, the plaintiff named as defendants the "Board of Trustees of Montgomery Community College and the president of the college." *Id.* The Fourth Circuit determined that the change from "Montgomery Community College" to the "Board of Trustees of Montgomery Community College" did not justify dismissal of plaintiff's claim against the board based on a failure to exhaust administrative remedies. *Id.* at 460. It characterized as "hypertechnical" the error of naming Montgomery Community College instead of its Board of Trustees. *Id.* at 460. As to the president of the college, the Court stated that suit may proceed against him because he was "being sued by Alvarado *only in his official capacity*." *Id.* at 461

(emphasis added).  Accordingly, the Court *allowed* suit to proceed against the college president and the Board of Trustees.  *Id.*

In *Causey*, 162 F.3d 795, an employee of the Baltimore Department of Public Works filed two charges of discrimination against the City of Baltimore.  *Id.* at 799-800.  After the EEOC dismissed the charges, the plaintiff filed suit in federal court.  *Id.* at 800.  The complaint named as defendants the Mayor of Baltimore, the City Council, the Board of Estimates, and several City employees, including the plaintiff's supervisor, in their individual and official capacities.  *Id.* at 799-800.  The Fourth Circuit stated that plaintiff's "EEO charge failed to put the individual defendants on notice that they were potentially subject to *personal liability* for the alleged violations," because they were not named in the charge.  Therefore, the Court concluded that "the individual defendants may not be held *personally liable* for any alleged violations of Title VII . . . ."  *Id.* at 800-01 (emphasis added).  However, the Court assumed, without deciding, that the individual defendants could be sued in their representative capacities.  *Id.* at 801 n.1 (citing *Alvarado*, 848 F.2d at 460-61).  And, the Fourth Circuit affirmed the district court's order, granting summary judgment to the defendants on the merits.  *Id.* at 804-05.

Chen did not name Mitchell, Steffen, or Zombro in the Charge.  *See* ECF 52-5.  Rather, he named only MHCC.  *Id.*  But, plaintiff has sued the Individual Defendants only in their official capacities.  ECF 14.  At the relevant time, Mitchell was the head of a large state agency, a position arguably analogous to the president of a college.  Given that the agency itself was named in the Charge, the reasoning in *Alvarado* would lend support to the ability to sue him in his official capacity.

In any event, as discussed, *infra*, all defendants are entitled to summary judgment on the merits. Accordingly, like the Court in *Causey*, I shall assume, without deciding, that suit may proceed against the Individual Defendants in their official capacities.

### 3. Proof of Discrimination

At trial, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *accord Price Waterhouse v. Hopkins*, 490 U.S. 228, 246 (1989). With regard to proof of intentional discrimination, "[a]s in any lawsuit, the plaintiff may prove his [or her] case by direct or circumstantial evidence." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983); *accord Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003). "Direct evidence must be evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal quotation omitted); *see also Direct Evidence*, BLACK'S LAW DICTIONARY, (10th ed. 2014) ("Evidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption.").

A court should "first consider whether [plaintiff] has shown any direct evidence of discrimination." *Young v. United Parcel Serv., Inc.*, 707 F.3d 437, 446 (4th Cir. 2013), *rev'd on other grounds*, ____ U.S. ____, 135 S. Ct 1338 (2015). In the absence of "direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic," a plaintiff in a Title VII case may use the burden shifting framework articulated in *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792 (1973), and its progeny.  *See Young*, 135 S. Ct. at 1345; *see Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (retaliation case).

The *McDonnell Douglas* proof scheme applies at trial.  Nevertheless, it has some utility at the summary judgment stage.  *See Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) ("Where, as here, a plaintiff does not allege direct evidence of discrimination, a plaintiff asserting racial discrimination may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas* . . . ."); *Stokes v. Va. Dep't of Corr.*, 512 F. App'x 281, 282 (4th Cir. 2013) ("Absent direct evidence of intentional discrimination, claims under Title VII are analyzed under the burden-shifting framework established in *McDonnell Douglas* . . . .").  The Fourth Circuit has observed that, "[n]otwithstanding the intricacies of proof schemes, the core of every Title VII case remains the same, necessitating resolution of 'the ultimate question of discrimination *vel non*.'" *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294-95 (4th Cir. 2010) (quoting *Aikens*, 460 U.S. at 714).[27]  Thus, "[b]y the time of appeal especially, the issue boils down to whether the plaintiff has presented a triable question of intentional discrimination . . . ." *Id.* at 295.

In the absence of direct evidence, a plaintiff may create a rebuttable presumption of discrimination by establishing, by a preponderance of evidence, a "prima facie case" of

_____

[27]  On several occasions where the employer proffered evidence in its motion for summary judgment of a legitimate reason for its adverse action, the Fourth Circuit has assumed, without deciding, that the plaintiff established a prima facie case. *See*, *e.g.*, *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007), *cert. denied*, 552 U.S. 1102 (2008); *Hux v. City of Newport News*, 451 F.3d 311, 314 (4th Cir. 2006); *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (en banc); *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319-20 (4th Cir. 2005); *cert. denied*, 546 U.S. 1091 (2006); *Rowe v. Marley Co.*, 233 F.3d 825, 829 (4th Cir. 2000); *see also Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 736-37 (D. Md. 2009); *Spriggs v. Pub. Serv. Comm'n*, 197 F. Supp. 2d 388, 394 (D. Md. 2002).

discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) ("The Supreme Court constructed the elements of the prima facie case to give plaintiffs who lack direct evidence a method for raising an inference of discrimination."). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an employee who was qualified for employment, "under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253.

Chen alleges that he was wrongfully terminated, in violation of Title VII. *See* ECF 14, ¶ 1. In a termination case under Title VII, the Fourth Circuit has said that, to establish a prima facie case of discrimination under Title VII, a plaintiff must show: "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2012) (internal quotations omitted).

As noted, if the plaintiff can establish a prima facie case, the burden then shifts to the defendant to "articulate some legitimate, non-discriminatory reason for treating employees outside the protected class better than employees within the protected class." *Young*, 135 S. Ct. at 1345 (internal quotations omitted); *see Reeves*, 530 U.S. at 142; *Hoyle*, 650 F.3d at 336. Once the defendant produces, "through the introduction of admissible evidence," legitimate, non-discriminatory reasons for its disputed employment action, "the presumption raised by the prima

facie case is rebutted," *Burdine*, 450 U.S. at 255, and "drops from the case . . . ." *Id.* at 255 n.10. Stated another way, if the employer produces evidence that could persuade a fact finder that it had a legitimate, non-discriminatory reason for its actions, "the defendant has done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case," and therefore, "whether the plaintiff really did so is no longer relevant." *Aikens*, 460 U.S. at 715.

When the defendant meets its burden of production, the plaintiff must then "'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253); *see also St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trustees of Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [the plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

To show pretext, a plaintiff must proffer sufficient evidence such that a reasonable trier of fact could conclude that the employer's explanation is false or "'unworthy of credence,'" *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (quoting *Burdine*, 450 U.S. at 256), and that discrimination was the true reason for the adverse employment action. *St. Mary's Honor Ctr.*, 509 U.S. at 515 (plaintiff must prove "*both* that the reason was false, *and* that discrimination was the real reason") (emphasis in *St. Mary's Honor Ctr.*); *accord Adams*, 640 F.3d at 560. The plaintiff does not "expose" a rationale as pretextual "by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it. The former would not create a genuine dispute, the latter would fail to be

material." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 216 (4th Cir. 2007) (internal quotations omitted).

When the question at issue is whether the "'decision maker'" acted with discriminatory animus, only the "'perception of the decision maker'" is "'relevant'" to the question. *Hux v. City of Newport News, Va.*, 451 F.3d 311, 319 (4th Cir. 2006) (citation omitted). In assessing a defendant's proffered reasons, the Fourth Circuit has "repeatedly observed" that it is not a court's "'province to decide whether an employer's reason for terminating an employee was wise, fair, or even correct, ultimately, so long as it truly was the reason for the employee's termination.'" *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 211 (4th Cir. 2014) (brackets omitted) (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)).

**a.**

Plaintiff, who was born in China, argues that he has presented direct evidence that his termination was based on his national origin. ECF 50 at 18. He maintains that he was suspended for five days, without pay, for the Chinese custom of "'leaning' over,' e.g. bowing" to express "regret" during the meeting with Zombro on December 2, 2010. *Id.*; *see also* ECF 52-2 at 4; ECF 50-4 at 3. Additionally, plaintiff relies on the email from Steffen to Zombro on November 16, 2011 (ECF 50-12 at 12), in which Steffen wrote, *inter alia*, *id.*: "Mr. Chen requested that Mr. David Sharp, be called to mediate, because he had a language problem. He stated that I said at staff meeting that David Sharp would mediate personnel issues where language problems were the issue. I have no recollection of ever suggesting this odd protocol." From this email, Chen argues that Steffen said plaintiff's accent constituted a "'language problem.'" ECF 50 at 19 (citation omitted). Further, plaintiff points to comments made within the December 2011 PEP

(ECF 48-9 at 4), in which LaBrecque said as to Chen, *id.*: "Need [sic] better communication skills. Chen does not understand the tasks we are asking of him. Language seems to a [sic] barrier."[28]

---

[28] Defendants cite to "*Chen Dep. Vol. II at 226*" for the proposition that "Chen admits that communication skills do not refer to an accent but ensuring that he correctly understands assignments and can communicate back and forth concerning the assignment." *See* ECF 48-1 at 14. Portions of Chen's deposition transcript are docketed at ECF 48-11. However, page 226 of the transcript, which is docketed as ECF 48-11 at 20, contains no such admission.

As indicated, direct evidence proves a fact without the factfinder having to draw inferences or make presumptions. *See Direct Evidence*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see also Warch*, 435 F.3d at 520. Here, Chen points to comments made by his supervisors regarding his having leaned over a table; his communication skills; and his lack of English language proficiency. These allegations do not constitute direct evidence of discrimination. I conclude that plaintiff has not presented direct evidence that his termination was due to his national origin. Accordingly, I shall proceed under the *McDonnell Douglas* burden shifting framework. *See Young*, 135 S. Ct. at 1345; *Foster*, 787 F.3d at 250.

**b.**

As noted, a plaintiff alleging termination in violation of Title VII must show that (1) he is a member of a protected class; (2) he has suffered an adverse employment action; (3) he was performing his job duties "at a level that met" his "employer's legitimate expectations at the time of the adverse employment action"; and (3) that his position remained vacant or was filled by a similarly qualified applicant who is not a member of the protected class. *See Bonds*, 629 F.3d at 386.

Defendants primarily focus on plaintiff's alleged failure to establish a prima facie case, claiming he did not meet legitimate job expectations. However, when an employer demonstrates a legitimate reason for an adverse employment action, the Fourth Circuit has assumed, without deciding, that the plaintiff established a prima facie case, and it proceeds to consider whether the employee has demonstrated pretext for discrimination. *See*, *e.g.*, *Holland*, 487 F.3d at 218. Therefore, I shall assume, *arguendo*, that plaintiff has established a prima facie case of discrimination based on his national origin.

Defendants assert that "Chen's work performance, not his national origin, led MHCC to terminate Chen's employment . . . ." ECF 48-1 at 3. According to defendants, the evidence shows that Chen inadequately performed his job duties, and his termination was not a pretext for discrimination. *Id.* at 16, 19. Defendants point out, among other things, that Chen received two consecutive PEP evaluations of "Unsatisfactory," one in June 2011 PEP (ECF 48-8) and the other in December 2011 (ECF 48-9). Therefore, his termination was mandatory under COMAR 17.04.05.03(G)(1). *See* ECF 52-1 at 2-3. The termination was upheld by the Maryland Court of Special Appeals in *Chen I*, as discussed earlier.

The Notice indicated that Chen was terminated only "[a]fter considering Mr. Chen's overall unsatisfactory performance evaluations," "his employment record, mitigating circumstances," "inappropriate and unprofessional behavior in the work place," and his "failure to meet standards at the end of the 180-day [PIP] period." ECF 52-1 at 4. On that basis, termination was "deemed the appropriate action." *Id.* at 3-4.

Chen argues that, at the time of his termination, he was performing his duties at a level meeting defendants' legitimate expectations and that his termination was a pretext for discrimination. *See* ECF 50 at 20-21, 26. Based on the record before me, however, it is clear that defendants' proffered reason for Chen's termination was not a pretext for discrimination.

The facts were set out at length previously, and need not be restated. Instead, I shall highlight some of them.

Chen received an overall evaluation of "Unsatisfactory" on the June 2011 PEP based on an assessment of eleven "position-specific performance elements" and nineteen "behavioral elements." *See* ECF 48-8 at 1-3; *see also* ECF 48-4, ¶ 6. In the June 2011 PEP, Bartnyska and

Ringel stated, *inter alia*, that plaintiff struggled to "[b]ecome proficient in task assignments," failed to "[f]ocus on users [sic] specific requests/requirements instead . . . formulating assumptions about tasks," printed "inappropriate documents," and failed to communicate effectively. ECF 48-8 at 4.

At Chen's deposition (ECF 48-11), he was asked: "Are you saying that you received a 1.27 [out of 3.00 overall] rating [on the June 2011 PEP] because of your national origin?" *Id.* at 17. Plaintiff responded, *id.*: "No, I didn't say that. I said -- you know, the sheer fact of the formation of this evaluation, which was completed by a person [Ringel], wh[o] only worked with me for three months, to complete a whole year evaluation for me is a sheer fabrication." Accordingly, it appears that Chen acknowledged that the "Unsatisfactory" rating he received on the June 2011 PEP was unrelated to his national origin, and therefore was not pretext for discrimination.[29]

Chen also received a PIP on June 23, 2011 (ECF 48-13), which stated that his performance "Need[ed] Work" because it was "Unsatisfactory" in multiple areas, including, *id.* (capitals in original): "Working independently"; "Self checking results"; "Ability to understand and use statistical formulas"; "Ability to accurately/clearly explain analytical results in written text"; "Demonstrates an increasing knowledge of the MCDB, expertise in its use"; "Reports progress, resolves questions needing decision with supervisor"; "Provides data analysis, text development, and document reviews for the health insurance coverage report"; and "Prepares at

---

[29] Defendants also cite to page 243 of Chen's deposition transcript, which is docketed as ECF 48-11 at 28. *See* ECF 48-1 at 14-15. That portion of the deposition transcript appears to pertain to the June 2011 PEP, but nowhere is that PEP identified. *See id.* Additionally, it appears to discuss Bartnyska, Zombro, or LaBrecque in relation to the unidentified PEP. However, the transcript lacks a reference to a particular supervisor.

least one technical analysis using the MCDB or other data in accordance with the approved study and design and timeline." ECF 48-13 at 1. The Notice of Termination indicated that Chen failed to meet the level of performance outlined by defendants in the PIP within the 180-day period. ECF 52-1 at 4.

Then, plaintiff received an overall evaluation of "Unsatisfactory" on the December 2011 PEP. *See* ECF 48-9 at 3. There, Chen received an evaluation of "Unsatisfactory" in each of the three "position-specific performance elements," and in thirteen of twenty "behavioral elements." *Id.* at 1-2. As indicated, plaintiff was "Unsatisfactory" in the behavioral elements of "Speaks effectively," "Writes effectively (clear, organized, appropriate grammar, punctuation)," and "interacts positively with co-workers." *Id.* In the December 2011 PEP, LaBrecque noted that Chen "Need[s] better communication skills. Chen does not understand the tasks we are asking of him. Language seems to a [sic] barrier." ECF 48-9 at 4. Additionally, LaBrecque stated that, despite Chen having done "adequate work when given highly structured and annotated instructions," Chen "create[d] numerous diversions as to why the work can't be done," "is at times extremely rude," "has a difficult time listening," and "attends meetings but ignores everyone and reads papers while in attendance." *Id.*

It is also noteworthy that Chen was disciplined on several occasions for inappropriate behavior in the workplace. *See* ECF 48-19 (Memorandum of Verbal Counseling, dated September 21, 2010); ECF 52-2 (Notice of Disciplinary Action of December 7, 2010); ECF 52-3 (Notice of Disciplinary Action of November 9, 2011); ECF 52-4 (Notice of Disciplinary Action of November 29, 2011). His behavior led to three suspensions, indicating that Chen's supervisors found him to be a difficult colleague with whom to work, and that he fell short of

their expectations in regard to professional behavior in the workplace.[30]  The ten- and fifteen-day suspensions were litigated by Chen, as discussed earlier.  The suspensions were upheld by the Maryland Court of Special Appeals in *Chen II*.

As noted, Chen's first suspension was for five days (ECF 52-2 at 3), and resulted from Chen raising his voice towards Bartnyska, leaning across a table towards her, and putting his face close to hers.  *Id* at 4; *see also* ECF 52-2 at 6-9.  Chen appealed the suspension on the grounds that Bartnyska, not Chen, yelled during the interaction, and that Chen had "bowed down" to Bartnyska.  ECF 50-4 at 3-4.  However, Chen's appeal was denied by Cowdry because Chen failed to present mitigating evidence.  ECF 50-4 at 2.

Plaintiff's second suspension was for ten days, and occurred after Chen had repeatedly raised his voice, rolled his eyes, laughed inappropriately, and interrupted Zombro while she spoke during a meeting on November 2, 2011.  ECF 52-3 at 6.  In response to that event, plaintiff stated, *inter alia*, that he had "completed all [his] assignments on time with prudence, efficiency, and professionalism."  ECF 50-10 at 2.  But, apart from his own averment, plaintiff points to no additional evidence to show that he was meeting defendants' legitimate expectations of his performance.

Chen's third suspension was for fifteen days, and resulted because he returned to the MHCC building on November 9, 2011, during the ten-day suspension (ECF 52-4 at 3; ECF 52-4

---

[30]  Defendants aver that plaintiff "admits that he was not disciplined . . . as a result of his national origin."  ECF 48-1 at 13-14.  Defendants point the Court to "*Chen Dep. Vol. II. at 198*."  As indicated, portions of Chen's deposition transcript were submitted as an exhibit to the Motion.  *See* ECF 48-11.  However, defendants failed to submit page "198" of the deposition transcript.  *See id.*

at 4-5), frightened Bartnyska by confronting her in the MHCC parking lot (ECF 52-4 at 4-5), and sought a meeting with Steffen to discuss the ten-day suspension. ECF 50-12 at 12.

Moreover, defendants contend that Chen spent an inappropriate amount of time on the internet, rather than performing his expected duties. ECF 48-1 at 17; ECF 52-3 at 6-7, 9-10. In response to this conduct, Chen's supervisors disconnected his access to the internet. ECF 48-1 at 17; ECF 52-3 at 6-7, 9-10. The Notice of Termination averred that Chen had been "abusing the [MHCC] internet policy" and that he had lost "internet privileges" in order to "improve his work performance." ECF 52-1 at 3. At his deposition, Chen was asked, ECF 48-11 at 17: "Are you saying your internet was turned off because of your national origin?" Chen responded, *id.*: "No, . . . I don't know why they turned me off."

Plaintiff directs the Court to the "Supervisors Comments" attached to the June 2011 PEP. *See* ECF 50-5 at 3-4; ECF 48-8 at 6-7 (same). In that document, Ringel noted that "Chen is an adequate SAS programmer." ECF 50-5 at 3; *see* ECF 48-8 at 6. In addition, Ringel noted that "a review of Chen's assignment sheets shows that SA programs are mostly completed on time. Some projects are completed with minimal supervision and some with closer supervision." ECF 48-8 at 7; *see* ECF 50-5 at 4. However, Ringel also stated that "Chen is prone to go off in his own direction," "needs improvement in his communication skills," and that Chen struggles to follow directions, take initiative in his work, and has been uncooperative with his colleagues. ECF 48-8 at 6-7; *see* ECF 50-5 at 3-4.

Additionally, Chen disagreed with the overall assessment of December 2011 PEP. ECF 48-9 at 4. He contested that PEP (ECF 50-13 at 2-4), asserting that he "deserve[d] a better than Satisfactory Overall Work Quality rating" on several assignments completed during 2011, and

had performed multiple programming duties "to the satisfaction of the end users." *Id.* at 2-3 (emphasis and capitals in original); *see also* ECF 50-9. However, the document Chen points to for support, the "Health Insurance Coverage in Maryland Through 2009" (ECF 50-3), appears to be the same "insurance coverage report" described in the December 2010 PEP as an example of plaintiff's failure to meet expectations. *See* ECF 48-7 at 2. The December 2010 PEP stated, *see* ECF 48-7 at 2, ¶ 5 (emphasis in original): "<u>Ability to accurate/clearly [sic] explain analytical results in written text</u>—inaccurate descriptions of analytical results in text for insurance coverage report."

It is not the role of the Court to determine whether defendants' reason for terminating Chen was correct, "so long as it truly was the reason" for Chen's termination. *See Walker*, 775 F.3d at 211; *see also Hux*, 451 F.3d at 391; *DeJarnette*, 133 F.3d at 299. In addition, "Title VII does not remedy everything that makes an employee unhappy." *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 329 (D. Md. 2003). Moreover, a court is not "a Super-personnel department weighing the prudence of employment decisions" of the employer. *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 271 (4th Cir. 2005).

Based on the record before the Court, and construing the evidence in the light most favorable to plaintiff, as I must, it is clear that Chen was terminated because his employer concluded that Chen failed in multiple ways to meet the legitimate expectations for employment. Plaintiff has failed to present evidence that demonstrates that defendants' proffered reason for Chen's termination was a pretext for discrimination based on his national origin.[31]

---

[31] Defendants also contend that plaintiff has failed to establish comparator evidence to indicate that any similarly situated employee outside plaintiff's protected class was treated differently than plaintiff. *See* ECF 48-1 at 18-19. Plaintiff opposes this argument with statistical

### IV.     Conclusion

For the foregoing reasons, I shall grant defendants' Motion.  An Order follows, consistent with this Memorandum Opinion.


Date: March 14, 2018                              _____/s/_____
                                                                   Ellen Lipton Hollander
                                                                   United States District Judge

---

analysis conducted by plaintiff, which appears to rely on questionable statistical assumptions pertaining to the national origin of other employees.  *See* ECF 50 at 24-26.  I need not reach the issue of comparator evidence.